## Coggin *vs.* The Central Railroad Company.

1. Can a chartered railroad company so part with the control of its locomotives and cars, run by the agency of steam upon its own road, as not to be responsible for personal injuries caused by the negligent running of the same?

2. One of the railroad company's engineers, running upon the company's road, is still its servant while in its pay and while liable to be discharged by it, though in running its locomotive and cars he may be temporarily subject to the orders of a telegraph company represented in the immediate control of the train by one of its employees, and though the train, with the railroad company's permission, be engaged, for the time being, solely in transporting materials for the telegraph company, with a force of attendants employed by the latter company to handle the materials and discharge them from the cars. Except as to acts and omissions dictated by express orders referable to the telegraph company, the engineer must observe the general law of diligence applicable to his vocation; and his failure to do so is negligence imputable to his master (the railroad company), who is liable for a personal injury resulting therefrom to one of the servants of the telegraph company rightfully upon the train as an attendant or laborer.

3. In the absence of any express contract as to risk, a railroad company, sued by a servant not its own for injuries received on the train, has no concern with risks which the servant took as between himself and his master. As between the plaintiff and the railroad company, the plaintiff took all risks whatsoever not occasioned by negligence imputable to the defendant, but none that arose from such negligence.

4. A written contract with a telegraph company is not, without some explanation, to be treated as a contract of a telegraph company bearing a different name. *Prima facie*, the two companies are not

one and the same, nor is there any presumption that the contracts of the one have become the contracts of the other. But where a contract is alleged as mere inducement, and is not described as in writing, and is not of a class required to be in writing, a parol contract express or implied may be proved.

5. By consolidating with or absorbing the Macon and Western Railroad company, under the act of 1872 authorizing the consolidation, the Central Railroad and Banking Company became liable to answer for a breach of duty by the former company towards a person who was rightfully upon one of its trains, and who, while being carried thereon, sustained a personal injury by reason of such breach.

Railroads. Master and servant. Contracts. Evidence. Before Judge Grice. Bibb Superior Court. April Term, 1878.

On October 5, 1875, Coggin commenced suit against the Central Railroad to recover $10,000.00 as damages for a personal injury.

The declaration was in case, and alleged, in substance, that plaintiff was an employee of the Western Union Telegraph Company, and as such was engaged on the 10th of May 1870, in unloading poles from defendant's cars, for repairing the telegraph line along defendant's road, between Macon and Atlanta—that defendant had contracted with said telegraph company to safely transport the said poles and other materials for such repairing and, also, plaintiff and the other servants and agents of said company employed about this work, and to give them opportunity safely to unload said poles and materials where the same were needed along the line—that said defendant did not so safely transport plaintiff while so employed, and did not give plaintiff an opportunity safely to unload said poles where the same were needed, but, on the contrary, while plaintiff was so engaged on said cars at the date aforesaid, and while the engine was proceeding at the usual and proper rate of speed for the performance of plaintiff's duties, the said defendant, by its agents and employees, carelessly, negligently and unnecessarily increased the speed of said engine and cars by a sudden, unnecessary and improper jerk, without giving any

signal of warning to plaintiff, and caused him, without any negligence on his part, to be violently jerked and thrown from said train under the wheels upon defendant's railway track, whereby plaintiff's body was badly bruised and cut, one leg broken, and great pain and suffering inflicted, and that, in consequence of such injuries, plaintiff has been permanently disabled from laboring as formerly. Plaintiff attained the age of twenty-one February 8, 1875.

The defendant pleaded the general issue.

The facts presented by the testimony for the plaintiff, so far as material to the points decided, were, in brief, as follows :

On May 10th, 1870, plaintiff was in the employ of the Western Union Telegraph Company distributing poles between Macon and Atlanta. He was, that day, on one of defendant's trains which was carrying the poles to be distributed between these points. He received an injury caused by the carelessness of the engineer in taking up the "slack" of the train. He was engaged at the time in throwing off the poles. The engine started without giving any signal. In taking up the "slack" of the train it jerked him between the cars, and he was injured. The train was moving along slowly, and the employees of the telegraph company, including the plaintiff, were engaged in throwing off poles at intervals of seventy or eighty yards. He was standing up, and the car was in motion, when he was thrown off. The car on which he was had on it twenty-five green poles. The bottom poles nearest the edge were thrown off successively as the train slowly moved along. At the time of the injury plaintiff was moving back some of the top poles so as to get at the others. Five men were on each car. Of these three would throw off and the other two would keep the poles from rolling down, and hand them to the others as they were needed. Plaintiff was one of the two to keep the poles from rolling down. He had hold of the big end of a pole lifting it up to cast it back on the pile when he was thrown off by the jerk.

The poles were placed on the car with the heavy ends to the rear of it. The heavy end of the one nearest the edge of the car would be slipped off on the ground, and by its own weight and the movement of the train, the pole would be pulled off. There was no lifting done in throwing them off. The train would not stop at all, but keep moving all the time. The engineer was at fault in throwing on the steam which gave the train the sudden jerk. He had but a short time to distribute the poles and make connection with the passenger train at the next station, about six miles off, and was consequently working under some excitement. When steam is taken off the cars run together so as to touch the bumpers, but they come together gradually, and when steam is put on suddenly, the shock of the couplings causes a sudden jerk to each car, but a skilful engineer avoids the trouble. One Awtry had charge of the hands who were employed by the telegraph company. He was on the engine at the time of the accident. There was also a conductor with the train who controlled its movements.

There was also introduced in evidence for the plaintiff, a contract between the Macon and Western Railroad Company and the American Telegraph Company, executed on June 12th, 1866, which contained the following provision :

" The party of the first part also agrees to transport, free of charge, the materials and men of the party of the second part when engaged in the construction, repairing, inspecting and superintending the telegraph line, so long as the party of the second part shall faithfully observe and fulfil the conditions and provisions in this agreement contained and by the party of the second part undertaken and agreed to be done."

The evidence for the defense presented the following facts : The conductor, engineer, fireman, wood-passer and Awtry, foreman of the hands of the telegraph company, were on the engine at the time of the accident. Nothing unusual occurred to produce the accident. The train was moving slowly and the engine was being run carefully.

Awtry had control of his men and directed the conductor as to what speed should be run. The conductor followed his instructions as closely as possible. The train was moving up grade when the plaintiff was hurt and it is impossible to jerk the cars when thus running. To produce the " jerking " the couplings have all to be together, and this can only happen when stopping on a level or running down grade.

By an act of the general assembly passed in August, 1872, the union and consolidation of the Macon and Western Railroad Company with the defendant, under the name and charter of the latter, was authorized and provided for. See acts of 1872, p. 351.

The jury found for the defendant.

The plaintiff moved for a new trial on the following grounds :

1. Because the verdict of the jury is contrary to the evidence.

2. Because the verdict of the jury is contrary to the law and the evidence.

3. Because the court erred in charging the jury, that if the plaintiff was injured by reason of a danger or risk that was incidental to his employment on the train that day then he cannot recover.

4. Because the court erred in charging the jury, that if the plaintiff was injured by the ordinary jerk or motion of the train, while he was standing on an open platform car, having a heavy pole in his arms, then he cannot recover.

5. Because the court erred in charging the jury, that if the train from which the plaintiff was thrown, although the property of the Macon and Western Railroad, and being run by the employees of the company, was in charge of and under the control of the Western Union Telegraph Company or its agents, and run by its direction and for its benefit and use, and the plaintiff was an employee of the company, engaged in the same service as was the train, in transporting and delivering the telegraph company's poles

along the line of railroad, and received the injuries he now complained of, he cannot recover from the Central Railroad Company, provided the plaintiff knew the train was so used by the telegraph company.

6. Because the court refused to give in charge the following written request of plaintiff's counsel, to-wit: "Under the written contract between the telegraph company and the railroad company, which has been put in evidence, the railroad company was liable for the proper transportation of the men and materials of the telegraph company. If plaintiff, as one of the employees of the telegraph company, was rightfully on the train under this contract, and if he was injured by the improper or careless conduct of the engineer of the railroad, then the railroad company is liable for the injuries thus done plaintiff."

The motion was overruled and a new trial refused. Plaintiff assigns such judgment as error.

MARSHALL J. CLARKE; BACON & RUTHERFORD; E. F. BEST, for plaintiff in error, cited Code, §3033; 30 *Ga.*, 22, 23, 27; 18 *Ib.*, 680; 34 *Ib.*, 330.

R. F. LYON, for defendant in error, cited acts of 1872 p. 351; 46 *Ga.*, 417; 29 Conn., 548; 25 Ala., 659; 2 Seld., 435.

BLECKLEY, Justice.

1. It may be doubted whether there is any way for a chartered railroad company, without special permission by statute, to let out one or more of its locomotives and cars to be run by steam upon the railway track of the corporation, and withdraw itself from responsibility for care and diligence in the manner of running. The charter privileges are granted to the corporation, and in accepting them, it assumes the correlevant obligations. One of the latter, and a very important one, where steam-power is employed, is the use of due care and diligence to guard against injury

to person or property. When the corporation chooses to part temporarily with the direct control of some of its dangerous machinery, does it sever itself from the consequences of the negligent management of that machinery upon its own road, on the part of those to whom it has, for the time being, entrusted the control? Are these latter substituted in place of the company as to measures of redress; and is the security afforded in other cases by the capital and resources of the company cut off from a party thus injured? Compare 49 *Ga.*, 355, with 46 *Ib.*, 417. The facts of the present case, however, do not render any decision upon this point necessary.

2. As between the two companies, whose servant was the engineer? Was he the servant of the railroad company, or of the telegraph company? If the former, and if he was negligent, and if his negligence caused the injury, his master must respond. He was employed by the railroad company, was in its pay, subject to be discharged by it, and was running its locomotive and its cars upon its track. The work in hand was the transportation and distribution of poles for the telegraph company. All the operatives, the plaintiff included, except the engineer and the conductor, were servants of the telegraph company, and one of these servants represented the latter company in supreme command. The progress and the pauses of the train were governed by his orders. When to start and stop, and how fast to move were matters for his regulation. His place, however, as it would seem, was not upon the locomotive but upon the cars. Most probably his wishes were signified to the conductor, and by the conductor to the engineer. It is probable, moreover, that his instructions, especially as to speed, were general and uniform, delivered once for all, and not in a constant flux of change or flow of repetition; more resembling, it may be supposed, established law than a series of special providences. His concern was mainly with results, and his supervision of means involved nothing beyond seeing that the poles reached their proper places on the

roadside in due time and manner. There is no evidence that he interfered or had a right to interfere with the application of steam, or with manipulating the engine. These were for·the engineer as an expert—as a craftsman skilled in his business. Certainly, to say the most, the connection of the two was not closer than that of pilot at the wheel and engineer at the throttle; and if so, the actual handling of the engine was exclusively for the engineer. Whatever the engineer did by the command of the telegraph company's superintending agent was not, we may concede, fault or negligence in the engineer. If there was an order to jerk, or to take up the slack too fast, or otherwise to misapply the power of the engine, obedience to the order may not have been matter for complaint by any servant of the telegraph company on board. But orders to move at a given speed, to stop and to start, include in themselves by implication a further order to do these things in a proper manner, unless some particular manner is expressed. To cover unusual jerks, or unsafe slacking, or other hazardous freaks by orders, it is necessary that the orders should clearly embrace them. Any possible doubt should go against such a construction of orders ; for it is not to be intended that any but ordinary and proper means are contemplated when an order to move, stop or start, is given. Whether the engineer was in fact negligent, and whether, if he was, that negligence caused the injury sued for, ought to be left open as mere matters of fact to be determined by a jury on the new trial which it is our purpose to award ; but, in law, that he was the servant of the railroad company in respect to the negligence with which he is charged we have no doubt. Though he was subject to certain orders from the telegraph company, these orders did not extend, and it was not contemplated that they should extend, to the details of his vocation, to the matters of art and skill which his duty involved. As to these, his orders are to be looked for in the laws of the land, and the rule of diligence which they impose is the rule by which his diligence is to be

measured; and for that degree of diligence on his part the railroad company was responsible. We see not why that responsibility would not hold as between the two companies themselves. If the property of the telegraph company had been damaged by the same acts of negligence which are now complained of by the plaintiff, or if the latter company had been a natural person and had received the wounds and bruises which the plaintiff received, what, in either such case, would have hindered a successful action by the telegraph company against the railroad company? If you hire from me the services of my skilled servant for a given occasion, and while about the business, he uses his skill negligently, and thereby you are damaged in property or person, am I not answerable? And will your presence and my absence make any difference in my liability, if you have done nothing which you ought not, nor omitted anything which you ought, to have done? And, we take it, that under the circumstances of the present case, the servants of the telegraph company were no less than the company itself under the protection of law against the engineer's negligence, if they were rightfully upon the cars. The engineer's services were not performed separately from the labor of these servants, but in connection with it; and this, doubtless, was contemplated in the contract, whatever that was, between the two companies. You and I, let it be supposed, are carrying on, each his own business, upon the same premises, I in my shop, and you in the open air beside it. Wanting work done in my line, it is arranged between us that you are to send a force of common laborers with a general superintendent of the operations, and that I will furnish all the implements, with an expert to use such of them as require special skill in handling, and that by the co-operation of all these, the work is to be executed in my shop. We both know, and the laborers know, the execution of such work is attended with peril rather more than ordinary, and that the degree of this peril depends chiefly on the skill and diligence of my expert. The work is en-

tered upon; the superintendent is faultless; the laborers are all faultless; the expert alone fails in duty, is negligent in the use of his skill and by reason of his negligence, one of the laborers is physically injured: am I not liable? My servant, while in my employment about my business, in my shop and with my tools, has negligently injured your servant engaged with him on the same general work; the skilled man on whose fidelity the safety of operations mainly depended, has proved derelict, and a common laborer at work on a plain part of the job has been crippled or otherwise wounded. Is the laborer to be without remedy, or turned over for redress to the expert alone? Rather is not his negligence my negligence also? Being his master, and his wrongful conduct having occurred while acting within the scope of his employment, am I not bound with him and for him? Code, §2961. While no case exactly analogous to the one at bar has been brought to our attention, and we have found none precisely in point, the principle which controls it is ruled or recognized in the following authorities: El. Bl. & El., 899; 6 M. & W., 499; Wood's, M. & S., 630, *et seq.*; Whar. on Neg. §177, *et seq.*; Shear. and Red. on Neg., §§73, 74; Story on Agency, 8 *ed.*, §§453 *a*, 453 *b*.

3. The controversy not being between the plaintiff and his own master, the telegraph company, it is quite immaterial how risk was regulated as between them. Relatively to the railroad company, the plaintiff certainly assumed all risk, except that arising from the negligence of that corporation or its servant, but as to the latter, it not being in any way waived or renounced, the general law respecting it is applicable, without modification.

4. The written contract put in evidence by the plaintiff was irrelevant, because the parties to it were the railroad company and the American Telegraph Company, whereas the plaintiff's employer, for whom the poles were carried and distributed, was the Western Union Telegraph Company. It is to be presumed that one and the same company does not bear two names, and no change of name appears;

nor is there any evidence that this contract or any other, of the former company, has become the contract of the latter company. While, therefore, this written contract cannot be regarded, there is evidence enough in the record to justify the inference that there was a contract of some kind between the railroad company and the Western Union Telegraph Company, under which the work was done. What the terms of it were we know not. It is to be presumed that the railroad company did not carry the poles gratuitously, but for compensation to be made or rendered in some way. No law requires such contracts to be in writing, and the parol evidence in the case bearing directly or indirectly on the existence of a contract, is pertinent. A contract between the two companies is alleged in the declaration merely by way of inducement, and is not described as being in writing.

5. It will be noticed that the railroad company of which we have hitherto spoken in this opinion is not sued, but that the suit is against the Central Railroad and Banking Company. By the authority of an act passed in 1872, the latter company absorbed the former, and the former voluntarily went out of existence as a corporation. One of the provisions of the act, cast upon the latter all the contracts of the former, but the act was silent as to torts. Now, the point is made that the present action is for a tort, and therefore that it is not maintainable. To this there are two replies, one of which may satisfy some minds, and the other others; and possibly many minds will be satisfied with neither, nor with both together. The first reply is, that the word contracts is not used in the act in a strict sense, but in a loose and comprehensive signification, as meaning liabilities, without respect to the means by which they arose. It is contrary to the general rule of law in this state to withdraw the assets of a dissolved corporation from the reach of creditors. Code, §1688. In this section of the Code the word debts is used, and there is a strong probability that the word was intended to embrace liabilities of all classes, torts included. Those having claims for torts,

not yet reduced to judgment, are not strictly creditors; their demands are not debts in the ordinary and proper meaning of the term, yet they are clearly within the equity of the statute. These same observations are applicable to the act of 1872, which happens to use the word contracts, instead of the word debts, which the Code uses, and instead of the word liabilities, which would very likely express what was really intended by both the act and the Code better than either of the words employed. The assets of the dissolved company all passed under the act of 1872 to the Central Railroad and Banking Company, and unless they are insufficient for the purpose, and there is no suggestion that they are, they should in its hands be as accessible to those whom the former company had wrongfully injured, as to those whom it had promised to pay. The second reply is, that the transaction alleged is, taken in its whole scope, and looked at to the bottom, a contract as well as a tort. When the company received the plaintiff on board its cars to be carried, the law implied a contract on its part to carry as safely and securely as the degree of diligence to which a private carrier, if not a public carrier, is bound, would accomplish. In connection with this contract, and based upon it, arose a duty the breach of which duty is the tort sued for, the breach of contract being also apparent from the averments. That the breach of duty instead of the breach of contract is perhaps the immediate gravamen of the action, and that the declaration is in case instead of assumpsit, are each more in the nature of formal than of substantial embarrassments. A recovery on either the tort or the contract, would bar a subsequent action on the other; and it is not apparent that the measure of damages would be substantially different. In this state forms of action are generally immaterial. It is only necessary to set forth the facts fully and distinctly; and in so doing, the present declaration sets forth facts from which a contract and its breach can be collected, as well as many other particulars.

Judgment reversed.