## JOHNSON *v.* THE STATE.

1. The evidence authorized the verdict.
2. The court did not err in admitting the evidence set out in divisions 2, 3, 4, and 5 of the opinion, for any reason assigned.
3. The language of the court during the progress of the trial, as set out in division 6 of the opinion, is not open to the objection that it was an expression of opinion of facts that had. been testifed to by the witness.
4. The objections made by counsel at the time of the trial, to the argument of State's counsel, were not full enough to embrace the exception stated in the conclusion of the assignment of error; and therefore the court did not err in refusing a new trial on the 10th ground of the motion for new trial.
5. "Newly discovered evidence that another person has admitted that he and certain others committed the offense is no cause for a new trial, inasmuch as the admissions would not be competent evidence in behalf of the accused were a new trial ordered."

No. 3861. APRIL 29, 1924.

Murder. Before Judge Hardeman. Fulton superior court. June 16, 1923.

*T. J. Ripley* and *W. M. Bailey,* for plaintiff in error.

*George M. Napier, attorney-general, John A. Boykin, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.

HILL, J. Will Johnson and Chester Johnson were jointly indicted for the offense of murder. The indictment alleged that on November 21, 1922, the accused did kill and murder Peter G. Poulos by shooting Poulos with a pistol. The jury, on the trial of Will Johnson, returned a verdict of guilty, without recommendation; and he was sentenced to be hanged.

1. There was one eye-witness to the homicide, Pete S. Poulos, who testified, in part, as follows: "I worked in a restaurant 11 South Forsyth street, 11 and 13 South Forsyth. I was helping George Poulos in the restaurant. He is the boss. Pete G. Poulos was working in there with us. He is dead. Will Johnson killed him. That is the man right there who shot him. It happened on the 21st day of November. Every morning we came to meet my cousin about 3:15. That was the regular practice in going to work at that time. We went to work the morning Pete got killed about 3:15. I opened the door. I got in and let Pete come in.

I fastened the front door—just half locked it, because the door is too hard to close. After I got inside the restaurant Pete G. go down stairs. We have a step-ladder in the kitchen [referring to diagram]. The kitchen is in the back end of the store. I don't know whether the trap door over the stair door and the ladder was locked the night before, because Pete went down first. I don't know how long it was before I followed Pete down stairs. The door was hard to close, and I take the door-key out of the restaurant door and left it half locked. I knew nobody could get in. I go inside and light the gas, made the coffee. I went down stairs. Pete was already there when I got down. Pete tried to change his clothes. Pete and I changed our clothes every morning down stairs. Each one had a locker. I opened the locker and hung my clothes inside. There was just one locker between Pete and my locker. Some one else had a locker in the middle. I did not get a chance to change my shoes. It was my custom to change my shoes there. I sat on a chair to change my shoes. I sat down in the chair and just put one leg on the top like this, and looked down to untie my shoes to change them. While I was that way I heard somebody say, 'G— d— you, I have got you.' Will Johnson said, 'G— d— you, I have got you now.' Peter was in the chair two feet from me. Will Johnson had been working there a long time. I had not seen Will Johnson that particular morning when I heard somebody say, 'G— d— you, I have got you now.' He had a black mask and a shiny pistol. I saw another man with him. I don't know who he was. I looked up and saw Will Johnson with a shiny pistol and a mask. I looked and saw two black masks and a shiny pistol. I thought it was like I was dreaming, the talk. Will Johnson said, 'Stand up.' I stand up, and Pete stand up, but Pete had his shoes off and had unfastened his breeches. Pete tried to fasten his breeches and Will said, 'No, G— d— you, don't do that.' Will said that. Then he said to the other one, 'Give me your pistol.' They tied both me and Pete, tied our arms. Will had two pistols. He took the other boy's pistol too. At that time they tied Pete first. After they tied me, then the other one taken one pistol. When I say the other one, I mean the same man that tied me and got the pistol. I forget his name. I recognize Will by his voice. He was the one that gave the orders. Will had worked for us before that, a right smart while.

13

I knew his voice. After he had tied both of us, he said, Will says, 'I want you to show me where you have the money.' It looked like he was talking to me. Pete tried to say something, but he don't let Pete say nothing. The other one found the plaster. It looked like plaster. Will said, 'Hey, what is that?' He stuck it on Pete's mouth. Will said stick it on Pete's mouth, the plaster. Yes, that is the thing. Will said, 'G— d— you. He has it on his nose.' He moved it from his nose. Then he talked to me. He said, 'I want your money.' I said, 'I have not got any money.' He got ten dollars from me. Ten dollars in ones. He said, 'I want you to open the safe.' I played that I could not understand the combination. Then he said, 'Well, bust it.' I said, 'I can't bust it.' Will went upstairs. Then the other one was near the dark place; near the place for coal. There is a light and dark place in the basement. One held Pete with a gun. They had me, may be this many feet from Pete. I saw Pete standing like this. Saw Pete standing like that, and grabbed the negro. They fight. I went with my hands tied though, and I went there. Got to help Pete. I could not stand to see my partner fight. They went to the dark place when I went to the dark place, I was walking. Pete and the other fellow were fighting. I went to help Pete. I heard him say, 'Help.' I don't know how many times. The one that was fighting said, 'Help,' the one that was fighting, Pete. Then I heard the steps, noise like coming down the steps near the dark place. Pete being in his undershirt, I saw him shoot Pete. He knocked me here with the pistol [indicating his head]. Will hit me. The same one who killed Pete, shot Pete. I fell in the floor, then I heard a shot upstairs. . . I ran up stairs and found Pete near the table in the kitchen. He says, 'They got me. Now I want you to do something of me.' I saw a hole right here made by the bullet. I tried to call up. I seen the police in the telephone book, I goes to the 'phone to call. I could not get the number. Every second seemed like a whole year to me. I said, 'Pete, you call up, I am going to run across to the Constitution building and tell them to call for an ambulance.' I got back. I met four policemen with two cars coming. I told them. I go inside with the policemen in the kitchen. I got Pete out of the room.

"One of the policemen there left the room and carried him out.

When they came out of the kitchen door, Pete said, 'I want to put on my shoes.' The policeman said, 'That is all right, you'll get your shoes next time.' They carried him out the front door. Pete says, 'I cannot see. Carry me somewhere to die.' The ambulance took him, the car; and the policemen called up the boss of the place. He came down and found him dead. After that after he said, 'I cannot see, take me to some place to die,' I never heard him say who shot him. Yes, I was down there the day those pictures were made. Yes, when I was down in the basement, before I went up stairs, I heard a shot fired. I don't know where Pete was at that time. I had been down stairs when I heard the shot, after Pete was shot, I heard one shot up stairs. My mind came back to me. I went up stairs quick. Pete was standing near the table in the kitchen. No, I never saw that hole in the transom over the door before Pete was shot. I have seen it afterwards. Yes, that picture shows where we were sitting down to undress. The smaller fellow in the picture is me. Yes, that is the way we were dressed at the time Will came in. The other fellow was my brother. He was sitting down at the same place Pete was sitting, when I first saw Will. Yes, he is dressed just about as Pete was at that time. Yes, that is the way we all was sitting at the time we heard Will say, 'I have got you now.' Yes, that picture with the chicken-coop in the back of the basement is where the fight took place when I went to try and help Pete. Yes, the fight took place where the chicken-coop is. I don't know whether the door that goes into the stairway from Forsyth street was closed or not the night before Pete was shot. The cook fastens that. Yes, it is my practice to keep that fastened. Yes, that picture there with a latch and pin run through a staple is the way we kept the back door to the basement fastened up. We usually kept both of these fastened up. Yes, the pin as shown in the picture stayed there all the time. The other fellow is the one that ties me. He tied me with wires. Will had two guns in his hands while the other fellow tied me. Yes, I saw those wires before. The wire with two loops on it, I don't know whether it was the one that tied me or not. It was that kind of wire. He tied me this way. My elbows were behind me, and he tied me with my elbows behind me. I just got loose and took the wire off. Slipped off one [of the wires] one end. I went upstairs and told Pete to turn aloose the

other one. Pete untied me the other one. I don't know whether Pete got loose or not. He was loose when I found him upstairs. The wire was off. Will Johnson was upstairs when Pete and the other fellow started a fighting. Pete's hands were fixed this way when they started to fight. They started to fight between the light and dark place. Pete started that fight just—he had been standing like this. His arms were still pinioned when he made a grab at the fellow. I went to his help. They fought just a few minutes before this other negro hollered 'help,' when this other darkey hollered for help. Will came down stairs from the steps, the one back in the kitchen. When he got down there he stood in the dark and shot Pete. No, Pete was fighting when he got shot. He was on his feet. Will shot Pete before he hit me with the pistol. I don't know what became of Will and his partner after I got struck and knocked down and my partner was shot. I did not see them any more. That's the last I saw of them. . . I don't know who fired the shot up stairs. These folks had a black mask over their heads. Yes, that looks like what they had over their heads. It was that color. Both of them had them on. They had gloves on their hands. I never paid attention to the gloves, the color of their hands—they both had them on, had gloves on their hands. The place where our locker is, and where I dress, is light. The place where the chicken-coop was kept is dark. Will was between the light and the dark place. They were coming from the dark place. They were looking at us. Yes, I could see the skin of these fellows right here [indicating front of neck] between the mask and the collar; the mask was raised. They were negroes. I don't know where that little page with something written on it was found. I did not see that. I know where that book and pencil was kept all the time. It was kept in the drawer in the kitchen. The table. Pete was just at the table when I heard the shot and went upstairs. He had his hands on the table. Yes, I know Peter's handwriting when I see it. By looking at that writing, I know Pete wrote it. I have lived with him three years in the same room. I know his writing when I see it. Yes, we had an iron safe that we kept money in. We had change, had change outside. The iron safe is upstairs in the dining-room where we lock things up in. Anybody can see the iron safe that worked there. We had a cash-register there. Yes, I unlocked

that safe myself. I could not say whether Will seen me or not when I unlocked it while Will was working there."

There was much evidence describing the scene of the homicide, as to threats, photographs of the place, etc., and testimony of other witnesses who identified the defendant as being on the outside of the building at about the time the homicide was alleged to have been committed. There was also evidence of a confession of the defendant. Just before he died the deceased stated to W. T. Milan, a city policeman, "Will Johnson shot me." We are of the opinion that the evidence is sufficient to authorize the jury to find that Will Johnson shot and killed the deceased without provocation.

2. The first, second, and third grounds of the amended motion for new trial complain that the court erred in not sustaining objections made by the defendant's counsel and in allowing a witness for the State to testify as to certain photographs offered in evidence to identify objects appearing thereon as being at the place where the homicide occurred. The questions, answers, and objections thereto are as follows: "Do you recognize this picture? If you do, state what it is. Answer. I do. Q. What is it? A. The restaurant." Movant objected to the admission of said evidence at the time same was offered, and then and there did urge the following grounds of objection to the question: "That witness could not state what was in the picture; that the picture speaks for itself." "Q. I will ask you what these two doors that appear to be raised are, right under the words 'Forsyth Restaurant?'" "A. The entrance to the basement," the objection being "that the picture exhibited spoke for itself." The court ruled: "He has got a right to explain it, whether it is in Atlanta, Ga., or in New York—what street this is on." "Q. Does picture number six correctly represent the way the door was fastened when you were there? A. Yes, sir." Movant objected to this evidence at the time it was offered, on the ground, "I object to 'represent,' 'correctly represent;' the picture speaks for itself," that the picture would mean exactly what it represented, and the explanation given by the witness of a picture taken after the crime was committed was harmful to movant. We are of the opinion that the court did not err in allowing this evidence as an aid to the jury in applying the evidence as to whether it related to the place and things where the

homicide occurred.    There is authority to the effect that photographs will not be received in evidence until they are verified or authenticated by some other evidence.    There must be something aliunde to show that they are photographs of the thing in question, and are fair and truthful representations thereof, before they can be introduced in evidence.    The question of the sufficiency of the preliminary proofs to identify photographs, or to show that it is a fair or accurate representation of the objects which it purports to portray, is a question committed to the discretion of the trial judge.    10 R. C. L. 1158, 1153, §§ 356, 360.    See also *Chance* v. *State,* 156 *Ga.* 428 (5)  (119 S. E. 303).

3.    Error is assigned, in the fourth ground of the motion for new trial, because the court admitted the following questions and answers:  "What did that string that you say was tied in the pin as now and run across the door and outside of the door, through the crack, what would that enable any one on the outside the door to do?  A.   Open the door.   Q.   How?   A.   By shaking or pulling the string."    Movant objected to the admission of said evidence at the time the same was offered, and then and there did urge the following grounds of objection to the same, to wit, "That is a conclusion.   He can tell facts."    By the court:  "I think the witness can tell that.   It is not a conclusion if he tells how it was done.    It is a statement of fact."    We do not think that the evidence objected to is a mere conclusion, and it is not open to the criticism urged against it at the time of the trial.    It is now argued that when the court said, "It is a statement of fact," this was the expression of an opinion.    No objection was urged or raised to the remark of the court at the time; and even if there had been, we do not think that the language of the court was an expression of opinion.    *Morgan* v. *Coleman,* 139 *Ga.* 459 (77 S. E. 579).

4.    Error is assigned because the court admitted the following questions and answers:   "Q.   Did you succeed in pulling the pin out of the staple?   A.   Yes, a half a dozen times.    Q.    When that happened were you able to come into the basement under Poulos' place of business?"    The question and answer are not inadmissible on the ground that the fact that the witness "is able to go in and out would not be binding on some one else; he may be able to go where some other man would not, and able to pull a latch-string

and where some other party would not," or because the evidence "is a conclusion, and not binding on the defendant." The court overruled the objection in the following language: "That becomes a matter for the jury under the evidence. The physical possibility of it." The remark of the trial judge is not open to the objection that it is an expression of opinion by him.

5. Error is assigned in the 7th ground of the motion for new trial, because the court admitted the following questions and answers of a witness for the State: "Q. Could a person in the rear alleyway get into that basement when the pin exhibited here was in the staple without that string attachment? Is it possible to get that pin out of the staple when in its place unless you had something on it to pull?" Objection by movant's attorney: "That would call for a mere inference." State's attorney: "I think it a physical fact." Movant's counsel, "He can tell the facts." By the court: "I don't think that would amount to an expression of an opinion. If he has examined it and states it as a physical impossibility, I overrule the objection." Witness then said that he could pull the string and pull the latch out of a little clasp, and then all you had to do was to open the door. This evidence is not inadmissible on the ground, as alleged by plaintiff in error, that it is an expression of opinion of the witness.

6. The eighth ground of the amended motion for new trial complains, "because the court, during the trial of the case, . . expressed an opinion as to the evidence of Pete S. Poulos, in the presence of the jury, to wit: "Q. Do you know which one actually did do the shooting down there? A. Will. Q. How do you know? A. How many times are you going to—" By the court: "Wait, don't answer. I am running this. I think three times is enough to answer the same question. Mr. Ripley, I won't curtail your right to cross-examine; but I have a right to control this case, and will do so that far. We would not get through before the first day of January, 1927. This question has been asked as many times as I will let it be asked this witness. This witness has testified over and over on direct and cross-examination— whether it is true or not I don't know; that is for the jury; but he has testified twenty times that Pete G. Poulos, the dead man, and the other fellow were in a fight, that the other fellow hollered for help, that he went to Pete's aid, and that this man came down

there and shot Pete. He says it was Will, because he recognized his voice, size and walk. You have asked him a dozen different times if he said it. He said it, and you cannot change it. The testimony may be true or untrue; it is for the jury." It is insisted that this ruling by the judge "was an expression of facts that had been proven by the witness, that it was a statement that the witness twenty times had testified to this fact; and that such statement was prejudicial and harmful to movant." In a note on this ground of the motion the trial judge says, "I qualify the above approval as to ground 8A, with the statement that the original record shows, and I certify as to this ground, that movant's counsel had for more than a dozen times repeated and continued to repeat the same question in practically the same language; and it became necessary, in order to complete the trial, to stop it." This language of the court was not objectionable on the ground presented. *Morgan* v. *Coleman,* supra.

7. The ninth ground of the motion for new trial was disapproved by the trial judge, and cannot be considered.

8. A new trial is asked in the 11th ground of the amended motion for new trial, on the ground of newly discovered evidence. It is alleged that since movant's trial and conviction two men, to wit, Chester Johnson and Clifford Walker, have pleaded guilty, in the superior court of Fulton County, to the murder of Pete G. Poulos, on November 21, 1922, and consent verdicts have been rendered in their cases, and they have been sentenced to serve life sentences in the penitentiary for the murder of the deceased, he being the same man that defendant was convicted of murdering on the same night and at the same time and place as in this case. It is alleged that this fact was unknown to movant, although movant contended in his statement that Chester Johnson and Clifford Walker were the guilty parties and not movant, and "in fact it had not taken place, and could not have been known to this movant at the time of the trial," etc. The alleged confessions are not attached to the motion for new trial, and only the verdicts and judgments against these two persons appear in the record. From these verdicts and judgments it appears that one of the persons alleged to have confessed was guilty of being a principal, and the other an accessory before the fact. The evidence in this case tends to show that there were two principals who were indicted for the murder

of the deceased; one of whom was found guilty and the other, according to the alleged newly discovered evidence, pleaded guilty as a principal.   Therefore the fact that the other person had pleaded guilty of being an accessory before the fact could not, under the evidence, relieve the defendant in this case from being a principal.   "Newly discovered evidence that another person has admitted that he and certain others committed the offense is no cause for a new trial, inasmuch as the admissions would not be competent evidence in behalf of the accused were a new trial ordered.   *Kelly* v. *State,* 82 *Ga.* 441, and cases cited."   *Briscoe* v. *State,* 95 *Ga.* 496 (20 S. E. 211).   And see *Rawlins* v. *State,* 126 *Ga.* 96, 99 (54 S. E. 924); *Attaway* v. *State,* 56 *Ga.* 363 (2).

9.   Other grounds of the motion for new trial, not specifically dealt with, are without merit.

*Judgment affirmed.   All the Justices concur.*