23220.   GEORGIA POWER COMPANY *v.* GILLESPIE.

DECIDED MARCH 3, 1934.

*Colquitt, Parker, Troutman & Arkwright, Robert S. Sams, Harllee Branch Jr.,* for plaintiff in error.

*White, Poole, Pearce & Gershon,* contra.

MacIntyre, J.  This was an action brought in the superior court of Fulton county, Georgia, for personal injuries sustained by the plaintiff, George B. Gillespie, as a result of the alleged negligence of the defendant.  The trial resulted in a verdict and judgment in favor of the plaintiff.  The defendant's motion for a new trial was overruled.  Certain demurrers to the plaintiff's petition were overruled, and objections to amendments offered by the plaintiff to his petition were overruled.  To these rulings the defendant excepted.

The defendant demurred separately to the allegations in paragraphs 18, 19, and 20 of the petition as amended, relating to the allegations that, under the particular facts alleged by the defendant, it constituted negligence to operate a street-car by having one man only act as both motorman and conductor.  The allegations of the petition relating to the operating of what is generally known as a one-man street-car are as follows, to wit:  That the place of the occurrence of the injury complained of and hereinafter described is on Peachtree street, at the east-west cross-walk between the intersection of Cain and Peachtree streets and the intersection of Harris and Peachtree streets, all being within the city limits of Atlanta of said State and County.  This cross-walk is in downtown Atlanta, where the traffic is extremely crowded, and the street-cars pass by this cross-walk every three or four minutes.  The time of the injury hereinafter alleged was at the time of the crowded and rushing evening traffic for taking persons from their offices to their homes.  Said cross-walk is constantly in use by the public as a place wherein Peachtree street could properly be crossed by pedestrians, and at said time of the evening was as fully in use as at the most crowded part or other time of the day.  That said cross-walk was demarcated with white lines by the police department of the City of Atlanta as a place in which pedestrians should cross said street; that the police department and its members are the proper authorities for permitting persons to cross said street at said time and place, and your petitioner was permitted by the police department of the City of Atlanta to cross said street at said time and place; that petitioner did walk across said street between two white lines about twelve feet apart, running directly across Peachtree street from the entrance of an alley twelve feet wide to the curb on the other side of Peachtree street; that the public and the pedestrians of the public had for several years prior to the time of the

injury herein referred to used said space between said white lines as a place to cross said street and the tracks of the defendant company; that said place was habitually used by the public without the disapproval of the defendant company, and that the employees of the defendant company who drive its cars over its tracks at said place were aware of the custom of the public to use said space between said white lines as a proper place to cross the street and the tracks of the defendant company; that at the time of the collision the conductor-motorman of defendant's car could have seen petitioner if he had looked, but actually did not see petitioner, because his attention to his duties as motorman was temporarily diverted in order that he might give his attention to his duties as a conductor. Among the conductor duties of said operator were the duties of assisting passengers to and from their seats, collecting fares, making change for passengers, and assorting fares and change in order to enable him to place or replace the same in his money carrier. Among his motorman duties were the duty of manipulating the controls of the car, to make it move and stop, and to keep an outlook straight ahead to see that he did not encounter persons or property with the street-car. There are times in the performance of his duties as a conductor when said operator can not and does not perform said duties as a motorman, and it was at one of these times that the motorman of defendant's car did fail to look ahead and see petitioner. It was the performance of one or some of these duties as a motorman which temporarily diverted said operator's attention from his duty of driving said car and keeping a lookout straight ahead. It is alleged that the defendant was negligent in that its agent was driving its car at the time of the collision while acting as both motorman and conductor; that the defendant was negligent in permitting its agent to drive its car at the time of the collision, without the assistance of a conductor; that the defendant was negligent in permitting its agent to control said car at the time of the collision in the dual capacity of motorman and conductor.

The mere fact that the defendant's street-car was operated by a single employee acting in the dual capacity of motorman and conductor would not of itself constitute negligence. See, in this connection, Di Prisco v. Wilmington City Ry. Co., 4 Pennewill (Del.), 527 Atl. 906), where it was said: "The defendant had a right to use the public highway, at the time and place of the accident, in common

with other travelers and persons who saw fit to use it. The public, as well as the defendant company, were entitled to use said highway. The electric-cars, of necessity, could use only those parts of it covered by their tracks, in as much as such cars move only upon their tracks within fixed limits. Within those lines the right of the company is superior to that of other users, and must not be unnecessarily interfered with or obstructed. In using the highway all persons are bound to the exercise of reasonable care to prevent collisions and accidents. Such care must be in proportion to the danger of the peculiar risks in each case. It is the duty of the company to provide competent and careful motormen and servants; to see that they use reasonable care in operating the cars; that the cars move at a reasonable rate of speed; that they slow up, or stop, if need be, where danger is imminent, and could, by the exercise of reasonable care, be seen or known in time to prevent accident; and that proper warning be given of the approach of the car at a crossing on the public highway. There is a like duty of exercising reasonable care on the part of the traveler. The company and the traveler are both required to use such reasonable care as the circumstances of the case demand; an increase of care on the part of both being required where there is an increase of danger. The right of each must be exercised in a reasonable and careful manner, so as not unreasonably to abridge or interfere with the right of the other. We are not prepared to lay down any absolute rule as to what precise acts of precaution are necessary to be done or left undone by persons who may have need to cross the tracks of electric railways. Nor will we attempt to specify the acts of precaution which are necessary to be done or omitted by one in the management of an electric car. Such acts necessarily must depend upon the circumstances of each particular case. The degree of care differs in different cases. A railway company is held to greater caution at street-crossings and in the more thronged streets of the densely populated portions of the city than in the less obstructed streets in the open or suburban parts. It is difficult, if not dangerous, to lay down any inflexible rules in this regard. The general rule is that the person in the management of the car and the person approaching a car or crossing a railway-track are bound to the reasonable use of their senses of sight and hearing for the prevention of accident; and also to the exercise of all such reasonable caution as ordinarily careful

and prudent persons would exercise in like circumstances. A person approaching a railway crossing with which he is familiar is bound to avail himself of his knowledge of the locality, and act accordingly."

The public have the right to the use of the street-car tracks for the purpose of crossing and recrossing, without being regarded as trespassers. The street-crossing was alleged to be in down-town Atlanta where the traffic was extremely crowded and the street-cars passed every three or four minutes; and it was alleged that the injury occurred at the time of the crowded and rushing evening traffic; that the cross-walk was constantly in use by pedestrians, and at said time of the evening was as fully in use as the most crowded part or other time of the day. Owing to the low rate of speed and the light construction and equipment of the street-cars, the public have the right to expect that they will be under control at street-crossings. The public have never surrendered the entire right of the street. This case is distinguishable from cases where a steam-railroad is involved, on which the rate of speed and the danger is much greater. *Howard* v. *Savannah Electric Co.*, 140 *Ga.* 482 (79 S. E. 112); *Bryant* v. *Georgia Railway & Power Co.*, 162 *Ga.* 511, 518 (134 S. E. 319).

Negligence in this case would be the want of such care as a reasonably prudent man would exercise under similar circumstances; it has been termed the failure to observe, for the protection of the interest of another, that degree of care, precaution, and vigilance which the circumstances justly demand, whereby such other person suffers injury. After all, negligence is a want of ordinary care. While the obligation to exercise care in the conduct of the defendant's business varies under the different circumstances, there would remain the duty to exercise such reasonable care as should be exercised by a person of ordinary prudence under like circumstances. On demurrer, what is ordinary care depends upon the facts and circumstances of the case as alleged. The term "ordinary care and diligence," when applied to the management of electric-railway cars in motion, should be understood to import that ordinary care and discretion which the particular circumstances of the place or the occasion require of the servant of the defendant company; and this will increase or diminish as the ordinary liability to danger and accident and to do injury to others is increased or diminished in the

movement and operation of the cars. If the accident should occur from the failure of the company to use ordinary care in operating its cars to provide competent and careful servants, sufficient in number to avoid accidents, it would have violated its duty and been negligent. Failure of a street-railway company to provide its cars with a conductor is not alone sufficient to constitute negligence justifying a recovery for the injury of a person in a collision with a car, unless the motorman at the time of the accident was prevented from doing his duty by trying to perform the duties of both motorman and conductor, and by reason thereof his failure to perform his duty as a motorman entered into and caused the injury.

Construing the specifications of negligence to which the general and special demurrer are addressed, in connection with the allegations of the petition descriptive of the circumstances attendant upon plaintiff's injury; we think the allegations are sufficient to withstand the demurrers. *Atlantic Coast Line Railroad Co.* v. *Whitney,* 13 *Ga. App.* 345 (2) (79 S. E. 181); *O'Dell* v. *Wolcott,* 14 *Ga. App.* 536 (3) (81 S. E. 819); *Charleston & Western Carolina Railway Co.* v. *Finley,* 10 *Ga. App.* 329 (2) (73 S. E. 542).

Ground 1 of the amendment to the motion for a new trial specified that the verdict and judgment rendered in this case are contrary to the evidence, for the reason that there was no evidence introduced showing that the cause of. action originated in Fulton county, Georgia, and, therefore, that there was not sufficient evidence to give the superior court of Fulton county jurisdiction over the cause of action.

The charter granted to the City of Atlanta by the General Assembly of Georgia showed that at the time of the injury Atlanta was in both Fulton and DeKalb counties. However, the caption of the act of incorporation (Ga. L. 1865, p. 268) says that it is "An act to amend the several acts incorporating the City of Atlanta in Fulton county." Section 5 of this act provides "that the corporate limits of said city [Atlanta] be so extended as to measure one mile and a half in each and every direction from the general passenger depot, the center of the present corporate limits." The act of 1874 (Ga. L. 1874, p. 116), amending the charter, says: "Section 1. That the inhabitants of the territory hereinafter designated are hereby continued corporate by the name and style of the City of Atlanta. . ." Section 2 of said act says that "the corporate limits

of the said city shall extend one mile and a half in each and every direction from a stone post or column standing in the eastern corner of the Union Passenger Depot in said city; that is to say, the corporate limits shall form a perfect circle around said stone post or column, the radius of which shall be one mile and a half."

Witness Pendley testified that he was secretary of the police department of the City of Atlanta, and "I would say that those crossmarks [where the injury occurred] are between three-fourths of a mile and a mile from the old Union Depot; that the old Union Depot stood at the corner of Pryor and Wall streets; that the new Union Depot had not been built over five years; that the new Union Depot is about eight blocks from the Norris building [in front of which the accident occurred]. There is not much difference between the distance of the old Union Depot and the new Union Depot from the Norris building." Thus it is shown that the collision took place in Fulton county, the same having occurred within a radius of one and a half miles of the old Union Depot.

The act incorporating the Fulton County Street Railroad Company (Ga. L. 1882-3, p. 222, section 3) says: "Said corporation shall have full power and authority to survey, lay out, construct and equip, use and enjoy lines or routes of street railroad in the City of Atlanta, and in the County of Fulton, as follows, to wit: a line or right of street railroad beginning at Pryor street near the Union Passenger Depot in the City of Atlanta, running thence . . ; thence along Spring street to West Baker street; thence along West Baker street to West Peachtree street, and thence along West Peachtree street to the city limits, and thence along West Peachtree road not exceeding two and one-half miles from the city limits. . ." The acts contained in the Georgia Laws of 1921, pp. 1193, 1194; 1895, p. 443; and 1870, p. 502, taken together, locate the old Governor's Mansion on the corner of Peachtree and Cain streets in the City of Atlanta and Fulton county.

Linking up the evidence of some of the witnesses, it shows that Baker street crosses Peachtree street at the junction of West Peachtree street, and that the place of injury was on Peachtree street between this junction and Cain street, and was not quite two blocks from said junction, and that Cain street going south along Peachtree street is two blocks from this junction. Hence the point of injury was between the corner of Peachtree and Cain streets, where

stood the old Governor's Mansion designated by the legislature as being on this corner in the City of Atlanta, Fulton county, and the intersection of Baker and West Peachtree streets, designated by the acts as being in Atlanta, Fulton county. Hence the point of injury was between two points within the City of Atlanta and Fulton county. Judicial notice can be taken of the boundaries of incorporated towns and cities of this State. *Seaboard Air-Line Ry.* v. *Peeples,* 12 *Ga. App.* 206 (77 S. E. 12). And judicial notice can be taken that the boundaries of the City of Atlanta have not contracted since 1874. We think the point of injury was sufficiently shown to be in Atlanta, Fulton county, Georgia. There were other supporting circumstances which tended to show that the injury occurred in Fulton county. The collision took place in down-town Atlanta, in the business section thereof, in front of the Norris building on Peachtree street and within a block which is about a half mile from Five Points.

The court charged the jury "It is a law of Georgia—and I read it from the Code and state it abstractly without expressing any opinion—that no person shall recover damages from a railroad company for injury to himself or his property where the same is done by his consent or is caused by his own negligence. If the complainant and the agents of the company are both at fault, the former may recover, but damages shall be diminished by the jury in proportion to the amount of default attributable to him." "Another code section reads: If the plaintiff by ordinary care could have avoided the consequences to himself caused by the defendant's negligence, he is not entitled to recover. But in other cases the defendant is not relieved although the plaintiff may in some way have contributed to the injury sustained."

The qualification which the court put upon section 2781 of the Civil Code is that contained in section 4426 of the Civil Code, which two sections are in pari materia; nor do we think that the charge tended to mislead and confuse the jury to the injury of the defendant. See *Southern Railway Co.* v. *Nichols,* 135 *Ga.* 11 (4), 15 (68 S. E. 789).

The defendant contends that the court erred in failing to charge the jury that the mere fact that the defendant's street-car was operated by a single employee, acting in the dual capacity of motorman and conductor, would not of itself constitute negligence. The

judge stated the contentions of both the plaintiff and the defendant as set out in the pleadings, and then charged the jury on the question of negligence, and then instructed them that the only negligence, if there be such in the case, that they were to consider as a basis of recovery, would be such only as they would believe to have been the proximate or producing cause of the injury. No negligence could be the basis of recovery unless it is, and you find it to be, the proximate or producing cause of the injury. In other words, if the defendant was negligent, but such negligence was not the proximate or producing cause of the injury, if any, then the plaintiff could not recover for any negligence that was not the producing or proximate cause of such injury. In other words, it seems to us that the judge in his charge to the jury left it to them to say whether or not, under all the facts and circumstances as disclosed by the evidence, the defendant was guilty of any one or more of the acts of negligence charged in the petition. *Charleston &c. R. Co.* v. *Anchors,* 10 *Ga. App.* 323 (73 S. E. 551). If the defendant wished any more specific instructions than those given in the charge in this case, he should have requested the same. *Stewart* v. *Mynatt,* 135 *Ga.* 637 (70 S. E. 325); *Davis* v. *Whitcomb,* 30 *Ga. App.* 497 (118 S. E. 488); *Huckabee* v. *Grace,* 48 *Ga. App.* 621 (173 S. E. 744), decided February 27, 1934. The judge also charged the jury: "Your inquiry would be, confining yourselves to these specifications of negligence, to determine whether in so far as the specifications of negligence, or any of them, are concerned, the defendant was guilty of negligence. You will take into consideration all of the evidence in the case that will illustrate that question—the time, place, circumstances, the surroundings, the instrumentalities used, the weather conditions, the question of light or darkness—all that occurred as disclosed by the evidence, and say for yourselves whether or not the defendant was guilty of negligence in so far as these specifications of negligence are concerned."

The collision happened at a down-town white marked street-crossing in the middle of the block, where the traffic was heavy and many people were accustomed to cross the street and street-car tracks thereon. The weather was misty and foggy. There was evidence for the plaintiff to the effect that he stopped, looked to the right and left, and listened; that he neither saw nor heard the street-car; that there was no physical obstruction, such as other

street-cars or automobiles, which obstructed his view; that there were many lights of the same color as the light on the front of the street-car in the background of the approaching car that struck him; that the glare of the lights along the street was the only reason he could give of why he did not see the car; that he could see the traffic lights on the corner because their color was different from the general background of the many other yellow or white lights; that as he crossed two rails, the first track, and as he reached about the third rail he again looked to the right, and right on him he saw the car; that he undertook to step back and the car struck him, and he did not know anything until the car had passed over and cut off his leg. It should be borne in mind that a street-car in a congested area of a down-town section of a city such as Atlanta, on marked street-crossings, is not altogether like a train propelled by steam with heavy and large machinery. *Harrison* v. *Georgia Ry. & El. Co.*, 134 *Ga.* 718 (68 S. E. 505); *Howard* v. *Savannah El. Co.,* supra; *Bryant* v. *Ga. Ry. & Power Co.,* supra. Street-cars are equipped so as to stop readily to meet the requirements of the character of their business. A street-railway company owes the duty to give signals by sounding its gong or otherwise when ordinary care demands it; it owes the duty of exercising ordinary care in keeping a lookout in such congested areas as the situation demands, especially at marked street-crossings where large numbers of people are accustomed to cross and this fact is known to the defendant. The plaintiff and the defendant's car both had the right to use the street at the point of collision. The public has not surrendered its right to use the street. The law says to both the plaintiff and the defendant: "You should use ordinary care in using the street." We think the evidence was sufficient to authorize the inference of negligence on the part of the defendant, at least as to its failure to give a warning of its approach to this marked street-crossing on the misty and foggy night, and that therefore the plaintiff was entitled to recover. See *Charleston & Western Carolina Ry. Co.* v. *Finley,* supra.

The next question is whether the plaintiff by the use of ordinary care could have avoided the injury. Whether when the plaintiff stopped and looked in both directions and listened and heard no approaching car and was prevented from seeing the car by the glare of many similar lights on the street which formed a background,

and then proceeded on the track, he was guilty of a lack of ordinary care, and whether such conditions would have produced a similar result to an ordinarily prudent person under similar circumstances we think was a question to be settled by the jury. It was a question for the jury to decide whether the defendant was or was not negligent in the running of its car at the time of the injury as alleged in the petition. It was also a question for them, under the evidence, whether the plaintiff was lacking in ordinary care, so as to bar a recovery. The evidence was sufficient to authorize the verdict, and the court did not err in overruling the general grounds of the motion for new trial.

On direct examination, a witness for the defendant, Miss Lowe, testified: "As near as I could tell, Mr. Gillespie slipped and fell, his feet going beneath the rear trucks of the car." On cross-examination she testified: "Mr. Gillespie seemed to slip and fall just as I looked. He was falling at the time I looked, to the best of my knowledge. He was stumbling forward. He did not fall with his hands backward. I did not see him fall at all. He seemed to stumble towards the front and then kind of sideways and down." At this point plaintiff's counsel handed to the witness, for inspection, a written statement, and questioned the witness with reference thereto, and later in the trial introduced a portion of this written statement, which read as follows: "When I saw Mr. Gillespie for the first time the front of the street-car had just passed over him and the front trucks were about even with him. He was falling about that time. As he fell he tended to turn on his back. His right shoulder went toward the car and his left shoulder went backward. He then staggered momentarily in the air and fell flat on his back about the middle of the car. The first time I saw the street-car on Mr. Gillespie was when Mr. Gillespie was falling just at the front trucks of the street-car. Mr. Gillespie did not step back. I did not see Mr. Gillespie slip, he merely fell." This portion of the written statement was objected to by the defendant on the ground that there were no contradictory statements in the written statement and the statement of the witness on the stand, and that the previous written statement was inadmissible. After the objection by counsel for the defendant the court said: "I understand that one paragraph is offered, and I allow that in evidence, and I tell the jury that it is offered for the sole purpose, on behalf

of Mr. White or Mr. Gillespie, of contradicting the witness Miss Lowe, and you are not to take what is in this paper as true as evidence. You could not consider it as original evidence, but if there is anything in it that contradicts any statement that she has made from the witness stand, you can consider that for whatever light it might throw on the weight or credit or faith you would give to the testimony she has delivered on the stand, and not for any other purpose. As it is offered by the plaintiff and admitted by the court for that sole purpose of contradicting things that she has testified to on the stand, if it does contradict that, you may consider it as it may affect her credibility. If it does not and you so find, then you would disregard that paper altogether." The defendant contends that this was an effort to impeach the witness, and as there were no contradictory statements in the oral and written statements, it was error to admit the statement in evidence. The question as to whether the plaintiff slipped and fell under the car, his feet going beneath the rear trucks or whether the car hit him first and he then fell, seems to be one of the questions in controversy. The statement at the trial seemed to indicate that the plaintiff slipped and fell; that he was stumbling forward, while the previous written statement seems to indicate that the plaintiff was staggering back as if he were stepping back; that he did not slip, he merely fell. We do not think that the judge committed reversible error in overruling the objection to the portion of the previous written statement admitted in evidence. He fully instructed the jury to determine whether there existed any conflict between the written testimony and that delivered at the trial, and further instructed them that if they should find that no such conflict existed, then they would disregard the written statement altogether. If there did exist a conflict, the trial judge correctly told the jury that they could consider it as affecting the credibility of the witness, and for no other purpose.

The defendant objected to questions of plaintiff's counsel to the witness Miss Lowe and the answers elicited showing that the witness had two uncles working for the defendant railway company. The court overruled the objections and the evidence was admitted. This witness testified that the counsel for plaintiff "asked me to come to court, and I told you [counsel for the plaintiff] that I would not and that I have reasons for being here today." It seems

to us that the trial judge did not err in admitting the evidence objected to. Especially is this true in view of the evidence above quoted. "Where the object of a cross-examination is to show bias or interest, so as to impeach the witness, great latitude should be allowed by the court, and [where] questions, if answered in the affirmative, might tend in that way, . . [they are] not objectionable." *Floyd* v. *Wallace*, 31 *Ga.* 688. "Any facts shown by the evidence which, according to human experience and observation, would naturally tend to cause the witness to lean towards one side or the other may be considered by the jury in passing upon the credibility of a witness's testimony and the weight to be given to his evidence." *Cochran* v. *State*, 113 *Ga.* 726 (39 S. E. 332).

Over the objection of defendant's counsel, the court admitted a photograph, marked exhibit "M," purporting to represent the scene of the accident under analagous conditions. The defendant's objections being on the grounds: (1) that the photograph was made on November 11, 1932 (the accident happening on December 15, 1930), and (2) that said photograph was misleading in that it did not and could not accurately and distinctly portray the conditions in existence at the time of the alleged accident, as the weather was clear when said photograph was taken and the weather was alleged to be misty or rainy at the time of the alleged accident. We do not think the trial judge committed error in admitting the photograph over the objections urged. The scene of the place of an accident can not be clearly presented to a jury by the testimony of witnesses, certainly not as clearly as by the use of photographs. It was said in Pruner *v.* Detroit United Ry., 173 Mich. 151 (139 N. W. 48) : "It is difficult, and often impossible, to obtain a photograph of the scene of the accident, at or about the time of the accident, but, having in mind the object sought, *the assisting of the jury by knowledge of the locality to judge the conduct of the parties with reference to the issue raised, the only practical rule would seem to be that the changes must not be such as to destroy the substantial identity. The changes should be carefully pointed out and brought to the jury's attention.*" (Italics ours.) They give the jury a conception of the surroundings, such as the permanent physical features of the place, and allow them to more clearly comprehend the testimony. After preliminary proof of their identity and accuracy they should be prima facie admissible in a proper case. If a photograph is intro-

duced by a party as showing all the conditions as they were at the time of the accident, and they do not represent the scene according to the undisputed evidence, such photograph should be excluded; however, on the other hand, if the photograph represents the conditions as contended for and shown by the evidence of the party offering the same to have existed at the time of the occurrence in controversy, they should be allowed to go to the jury as illustrative of his evidence, under proper instructions. See *Butler* v. *State,* 142 *Ga.* 286 (82 S. E. 654); *Shaw* v. *State,* 83 *Ga.* 92 (9 S. E. 768). There was no objection to the photograph offered for failure to prove the identity of the place photographed or its accuracy. The only objections urged were those set out above. The objection that the photograph was taken sometime after the date of the accident, and that for that reason it was inadmissible, is untenable. It is to be presumed that the physical surroundings were substantially the same at the time the picture was taken as they were at the time of the accident; especially is this true where no great amount of time has elapsed. If there had been any *material* change in the surroundings, the defendant could easily have proved it. See, in this connection, Wade *v.* Southern Ry. Co., 89 S. C. 280 (71 S. E. 859). It seems, as shown by the record, that the plaintiff introduced several other pictures along with the one objected to, showing the scene of the accident, some of them being taken in the daytime and one being taken at night when it was raining. The record does not disclose that it was the intention of the plaintiff, in introducing the particular photograph objected to, to show the actual atmospheric conditions at the time of the accident,—that is, that it was not raining,—but it is conceded by all that such was the condition. The judge, on objection being made, instructed the jury with reference to the photograph as follows: "Gentlemen of the jury, I want to instruct you that photographs could only be useful, in a case like this, for the purpose of illustrating the occurrence at the time and place where it occurred. So, in considering these photographs that are in evidence, and looking at them, you would look at them with that in mind, to what extent they do illustrate the occurrence that took place, and, considering any change that took place in the scene from the time of the occurrence to the time that the photographs were taken, and considering any change in lighting arrangement, the lighting of the street-cars, the question of light or darkness, the

question of mist or rain, you will take all of that into consideration, and if they are useful, then you will consider that, but only as they illustrate the situation as it existed at the time of the occurrence." Under this instruction of the court the photograph objected to could not have been misleading or confusing to the jury. It was admissible to show a mere general representation of the locus in quo. It was not assumed that the photographs portrayed the rain conditions at the time of the injury, but they seem to have been offered for the purpose of showing the permanent conditions as distinct from those of a transient or temporary nature. See 22 C. J. 921; Skaling v. Sheedy, 101 Conn. 545 (126 Atl. 721); City of Thomasville v. Crowell, 22 Ga. App. 383 (96 S. E. 335); Griggs v. Kansas City Rys. Co., 228 S. W. 508; Taylor v. Bland, 77 Pa. Sup. Ct. 551. The cases of Grimm v. East St. Louis R. Co., 180 Ill. 92, Colonial Ref. Co. v. Lathrop (Okla.), 166 Pac. 747, and Chicago &c. R. Co. v. Rorvig, 217 Fed. 953, do not seem to be in conflict with the ruling here made.

Judgment affirmed. Stephens, J., and Guerry, J., concur.