## 32911. STEMBRIDGE *v*. THE STATE.

DECIDED JULY 12, 1950. REHEARING DENIED JULY 26, 1950.

*Frank O. Evans, Marion Ennis, J. M. Watts Jr., Martin, Snow & Grant,* for plaintiff in error.

*C. S. Baldwin Jr., Solicitor-General,* contra.

MacINTYRE, P. J. 1. During the course of the trial, J. E.

Jones was called to the stand as a witness for the State and testified as follows: "I am an operator with the Georgia Bureau of Investigation and my duty is to assist the sheriffs and municipal governing authorities and superior court judges in the investigation of any criminal case in which we are invited. I was called on this case on March 7th, the night it happened, and I went around to the hospital that night and talked to Emma Johnekin and while I was there, I noticed three wounds on her. There could have been more. There was one in the right arm; there was another in the abdomen and there was another burned mark on the back on the left side. There was a bullet hole in the shoulder but I couldn't swear which side of the body it was on. It seemed as if the burned mark on her back had been caused by a projectile from a pistol. That makes 4, three that entered the body and one that grazed her back. Emma was conscious that night. She realized the condition she was in as to the seriousness of her wounds. She had four wounds on her and appeared to be in pain. There was a marked abrasion on the right side of her head as if she might have been struck by something and the skin was broken. She was complaining about the pain she was in; had her hand over this wound in her abdomen and she was frowning in her face, showed she was in intense pain, when I went into the room. I couldn't swear how long she lived after being shot up. I went back to the hospital two days later on a trip and she was dead at that time. I asked her to tell me what had happened exactly to the best of her memory and belief. I requested that she be extremely careful in the testimony she would give me. Q. What did she say as to her being shot? . . [Objection by counsel for defendant] By the Court: Is there anything here to show that she was conscious at that time? Q. Was she fully conscious? A. Yes, she was fully conscious. Q. Was she advised of her serious condition? A. I didn't hear the doctor advise her. However, I did myself advise her of what I had heard. In other words, if I may speak a few minutes, the chief of police contacted me at the cafe down town. I was eating supper. He told me two women had been shot and were in the hospital and he had already been to the hospital or Mr. Beckum had already been to the hospital, one or the other and that they were in

critical condition and they wanted me to go up and talk with them. I found Emma . . [Objection] Did she make a statement to you as to the cause of her being shot? A. Yes, she did. Q. As to who shot her? A. Yes. . . Q. Did you write down what she said? A. Yes. Q. What did she say? A. May I read it? A. Yes (Witness reads) When Mr. Stembridge and Terry came there all of us were on the porch. He asked about Richard and Johnny told him Richard was not here. 'Where is Richard?' 'He is working.' And Johnny changed the subject, Johnny said 'will pay you, Mr. Stembridge, for what I owe you. I went to work at the State.' 'Haven't you been working there all the time?' 'No, sir.' Then he asked Johnny, 'Will you sign a paper for Richard?' 'No, it doesn't seem right.' And she spoke up, 'Lord have mercy,' said 'He has got on brass knucks' and turned to Mr. Stembridge and said, 'Haven't you?' . . [Objection] 'He has got on brass knucks—haven't you?' He turned to go in the house. 'God damn it, what is it to you?' And he grabbed me and hit me with his knucks. He hit me on the head. Mary ran where I was and pulled him loose from me. He shot me in the hand and he shot at Mary. I went on inside the house and sat on the trunk. He came to the door and shot me in the shoulder and in the stomach. I didn't have a gun, neither a knife and Mary had neither gun nor knife. I swear this information is true. When he hit me I grabbed him and Mary pulled us apart. He had a gun and started firing. Signed, Emma Johnekin." Counsel for the defendant objected to this statement of Emma Johnekin which the witness read into the evidence upon the ground that the proper foundation had not been laid for its admission as a dying declaration. On cross-examination the witness J. E. Jones testified: "There were other people in the room that heard her make the same groans and when I asked her the question did she realize the seriousness of her wounds and she said yes and I asked her if she knew she would probably not live through it and she said yes and when I asked her to be very careful and not to leave out anything at all, I explained to her, I even told her I was sure she didn't want to go on to her reward and have the blood of some innocent person on her because she failed to make some statement and she said yes and then she began to talk and I began writing

and during that time the doctor came in and he put the probe into her abdomen about 14 inches down into her abdomen and as soon as he took it out I asked him what was her condition. He did not answer my question one way or the other, he went on out to the other room." "Declarations by any person in the article of death, who is conscious of his condition, as to the cause of his death and the person who killed him, shall be admissible in evidence in a prosecution for the homicide." Code, § 38-307. "Consciousness on the part of the deceased that he was dying and was in extremis may be inferred, not only from his statements, but also from the nature of the wound and other circumstances. . . . The actual period of survival after making the declaration is not controlling. The question does not depend upon the length of time between the declaration and the death of the declarant, but upon the declarant's mind at the time of the declaration, and his belief that he is in a dying condition." *Johnson* v. *State*, 169 *Ga.* 814 (3) (152 S. E. 76). " 'It is not necessary for the State to show affirmatively that a person who had been shot said he was in a dying condition, in order to admit proof of his declarations, if in point of fact he was in articulo mortis, and the circumstances were such that he must have known that he was in a dying condition.' *Washington* v. *State*, 137 *Ga.* 218 (73 S. E. 512). 'On the trial of a murder case, if at the time of making declarations the condition of the wounded person making them, the nature of his wounds, the length of time after making the declaration before he expired, and all the circumstances make a prima facie case that he was in the article of death, and conscious of his condition when he made the declarations, such declarations should be admitted in evidence by the court under proper instructions to the jury.' *Green* v. *State*, 154 *Ga.* 118 (7), 137 (113 S. E. 536)." *Parker* v. *State*, 197 *Ga.* 349 (29 S. E. 2d, 61). In the instant case the preliminary evidence was sufficient to establish a prima facie foundation for the admission of the evidence of the witness Jones as to the statement made to him by the deceased as the ultimate determination as to whether the deceased was in the article of death and realized her condition is for the jury and it appears from the record that the court fully instructed the jury on this subject. *Parker* v. *State*, supra. *Emmett* v. *State*, 195 *Ga.* 517

(25 S. E. 2d, 9); *Plummer* v. *State*, 200 *Ga.* 641 (38 S. E. 2d, 411); *Morakes* v. *State*, 201 *Ga.* 425, 436 (40 S. E. 2d, 120); *Satterfield* v. *State*, 68 *Ga. App.* 7 (21 S. E. 2d, 861). It follows that the court did not err in admitting in evidence the testimony objected to in this ground.

2. In special ground 3, error is assigned upon the admission of the following evidence over objection: " 'Mr. Ellis, did you take any photographs or pictures of the body of Emma Johnekin, the deceased in this case?' 'Yes, I did.' 'Have you got those pictures with you?' 'Yes.' 'Did you take this picture?' 'Yes, I did my self.' 'Where was the woman when you took these two pictures—was she dead then?' 'Yes.' 'Did you see this one made by Mr. Stancill?' 'Yes.' 'Where was the body then?' 'In the undertaking establishment at Eatonton.' 'Come down here—I will ask you whether or not this spot is the bullet wound in the back of her shoulder?' 'Yes.' 'Did you see this before she was dead, those holes?' 'Yes.' 'On her back in this picture, I will ask you whether or not that is a burned place where the bullet evidently crossed her back?' 'Yes, I would say so.' 'This cut open place here on her body is what?' 'That is where they cut it open to get the bullet out of her pelvis.' 'This picture here of her abdomen, you see three holes there?' 'Yes.' 'What are they?' 'This one here goes right into the abdomen and this one just goes in and comes back out and goes back in.' 'It went in and came out and then went back in?' 'Yes.' 'Explain that wound on her to the jury.' 'The bullet went in here and came out and went back in there.' "

At the time and as soon as this evidence and the pictures were offered the defendant's counsel objected "to pictures of the body of the deceased being exhibited to this jury. It is prejudicial to this jury, improper and I move that this witness not be allowed to exhibit to this jury pictures of the deceased woman." At the conclusion of the evidence objected to the defendant's counsel renewed his objection: "I would like to renew my objection to the admission in evidence of the three pictures he has offered and especially do I direct my remarks to the picture that was made after the body had been mutilated and the change in the character of the body when they were getting this bullet out. I think that would not be admissible; it was not as it was when

she died but had been changed by the operation of the doctors."
The additional ground of objection was that the evidence was
prejudicial and hurtful as designed to arouse the sympathy and
emotions of the jury.

In *Bryan* v. *State,* 206 *Ga.* 73 (55 S. E. 2d, 574), it is said:
"Photographs when properly identified by preliminary proof,
as showing an accurate representation of an object which is
material to the issue, are admissible. *Johnson* v. *State,* 158
*Ga.* 192 (2) (123 S. E. 120). The location of the wounds was
material to the issue. *Franklin* v. *State,* 69 *Ga.* 36 (1) (47 Am.
R. 748); *Butler* v. *State,* 142 *Ga.* 286 (9) (82 S. E. 654); *Shafer*
v. *State,* 193 *Ga.* 748 (7) (20 S. E. 2d, 34); *Russell* v. *State,* 196
*Ga.* 275 (1) (26 S. E. 2d, 528); *Weaver* v. *State,* 199 *Ga.* 267
(3) (34 S. E. 2d, 163). To exclude the photographs on the
ground that there had already been testimony as to the location
of the wounds, would, in effect, preclude the State from estab-
lishing a material fact by more than one source of evidence. To
exclude it on the ground that it would inflame the minds of the
jury, would prevent the State from establishing facts material
to the issue. A relevant and material fact is not subject to an
objection that it would inflame the minds of the jurors."

In the instant case all of the photographs objected to were ex-
plained as representing the location and nature of the wounds
upon the body of the deceased at the time she was killed. The
only change shown in the pictures was that one of the wounds
pictured showed "where they [the doctors] cut it open to get
the bullet out of the pelvis," and this change had been carefully
pointed out and brought to the attention of the jury. This
change did not destroy the substantial identity of the wounds on
the body of the person killed. *Georgia Power Co.* v. *Gillespie,*
48 *Ga. App.* 688, 700, 173 S. E. 755); *City of Thomasville* v.
*Crowell,* 22 *Ga. App.* 383 (96 S. E. 335). The nature of these
wounds was important because of the issue growing out of the
question of how the shots were fired, that is, whether in a strug-
gle over the gun or guns or otherwise; and these photographs,
with the accompanying explanation were properly admitted as
relative and material. *Russell* v. *State,* supra.

The case of *Franklin* v. *State,* supra, upon which counsel for
defendant rely rather sustains the ruling made here than the

contention of the defendant, and we find nothing in the number of foreign cases cited by defendant's counsel which would require a different ruling from what we here hold. This ground of the motion for a new trial is without merit.

3. " 'Under repeated decisions of this court and of the Supreme Court, each special ground of a motion for a new trial must be complete within itself; and when so incomplete as to require reference to the brief of evidence, or to some other portion of the record, in order to determine what was the alleged error and whether such error was material, the ground will not be considered by the reviewing court.' *McCall* v. *State,* 23 *Ga. App.* 770 (99 S. E. 471); *Roddenberry Hardware Co.* v. *Merritt,* 17 *Ga. App.* 425 (87 S. E. 681) and citations." *Franklin* v. *State,* 28 *Ga. App.* 460 (112 S. E. 170); *Ewing* v. *State,* 183 *Ga.* 127 (187 S. E. 628). Special grounds 4 and 5 of the motion for a new trial are not considered.

4. In this case where the jury was authorized to find that in the same criminal transaction the deceased was shot four times and her aunt was likewise shot four times (not dying however) and that some of the bullets entered the aunt's body from the rear and some of them entered otherwise, all of which shots were so closely connected and interwoven with the fatal shooting of the niece as to become a part of the res gestae whether the wounds in the aunt's body were inflicted by the defendant, as contended by him, or by a joint conspirator, as contended by the State, it was not reversible error to allow the State to let the aunt, while testifying as a witness, to exhibit such wounds as tending to show how many shots were fired and as tending to show, from the place where the bullets entered her body, the relative position of the party (whether the defendant or a joint conspirator) who shot and wounded the aunt during the criminal transaction which caused the death of the niece and caused the aunt to be shot. *Reese* v. *State,* 7 *Ga.* 373; *Revel* v. *State,* 26 *Ga.* 275, 281; *Arnold* v. *State,* 131 *Ga.* 494 (1) (62 S. E. 806); *Glover* v. *State,* 137 *Ga.* 82 (1) (72 S. E. 926); *Carter* v. *State,* 15 *Ga. App.* 343 (1) (83 S. E. 153); *Helms* v. *State,* 138 *Ga.* 826, 829 (76 S. E. 353). As to the exhibition of the wounds, see *Wagoner* v. *State,* 52 *Ga. App.* 379 (4) (183 S. E. 209); *Southern Railway Co.* v. *Brock,* 132 *Ga.* 858 (7) (64 S. E. 1083). The

objections in special ground 1 to the exhibition of any wounds to the jury by this particular witness because it was being offered for the purpose of prejudicing the jury and was not relevant and germane to any issue involved in this particular case, and that the disrobing of the witness to the extent which was necessary to exhibit these wounds would arouse the emotions and sympathy of the jury and was for the purpose of prejudicing the jury, do not disclose reversible error, and this ground of the motion for a new trial is without merit.

5. In discussing the general grounds of the motion for a new trial the defendant argues at great length that some of the witnesses testified inconsistently that they contradicted other witnesses, both for the State and the defendant, and that one of the eyewitnesses for the State was impeached by witnesses who swore that from the general reputation this witness's character was bad and that they would not believe her on oath. The State, however, introduced witnesses who swore that from general reputation they knew her character to be good and that they would believe her on oath. "Our Supreme Court has said, in a case where the verdict would have been an outrage upon justice unless a particular witness in behalf of the plaintiff in the court below had testified truly: 'The credibility of this witness was attacked by every means known to the law, including contradiction by another witness, evidence of bad character, and his own previous affidavit to a written report of the facts at variance with his testimony at the trial; yet the jury, if not themselves corrupt, must have believed him, for they found for the plaintiff; and the court below having approved their finding, this court is constrained by law to acquiesce. Relatively to the revising powers of this court, the jury are the exclusive judges of the credibility of the witnesses. The law provides for setting aside judgments obtained by perjury after conviction of that offense.' *Rome Railroad Co.* v. *Barnett,* 94 *Ga.* 446 (5) (15 S. E. 639). This court has said: 'The whole question of the credibility of witnesses is wisely left to the jury under any and all circumstances; and though Ananias and Sapphira spoke again, the law would not strike them dead, but would leave their testimony to be weighed and accepted or rejected by the jury.' *Brown* v. *State,* 10 *Ga. App.* 50, 56, (72 S. E. 537)." *Aycock* v. *State,* 62 *Ga. App.* 812, 814 (10 S. E. 2d, 84).

"If a witness testifies inconsistently, that circumstance goes to his credit, but does not authorize the court to hold that the testimony of a witness not a party has no probative value because it is inconsistent or self-contradictory. *Reaves* v. *Columbus Electric & Power Co.*, 32 *Ga. App.* 140 (3)." *Randall* v. *State*, 73 *Ga. App.* 354, 368 (36 S. E. 2d, 450). The evidence for the State, if believed, was sufficient to support the verdict. The jury being the judges of the weight of the evidence, this court can not disturb the judgment refusing a new trial (*Carter* v. *State*, 58 *Ga. App.* 16, 197 S. E. 333) on the ground only that the verdict was contrary to the evidence and decidedly against the weight of the evidence. *Aycock* v. *State*, 62 *Ga. App.* 814 (supra); *Puckett* v. *State*, 159 *Ga.* 230 (125 S. E. 208). " 'A jury is authorized to believe a part of the defendant's statement, though the whole statement is not credible to them; and the same thing is true as to the testimony of each and every witness who appears before the jury.' *Wilson* v. *State*, 9 *Ga. App.* 297 (2) (70 S. E. 1125). See also *Reaves* v. *Columbus Electric &c. Co.*, 32 *Ga. App.* 140, 151 (122 S. E. 824); *Sutton* v. *State*, 123 *Ga.* 125, 127 (51 S. E. 316); Code, § 38-415. In making up their verdict, 'it is the prerogative of the jury to believe certain parts only of the defendant's statement and to combine those parts with certain parts only of the evidence.' *Goldsmith* v. *State*, 54 *Ga. App.* 268, 271 (187 S. E. 694)." *Gray* v. *State*, 77 *Ga. App.* 747, 751 (49 S. E. 2d, 829). The rule stated in *Patton* v. *State*, 117 *Ga.* 230 (4) (43 S. E. 533), that "in testing the sufficiency of evidence this court can not consider the credibility of witnesses, but it may consider the nature of the testimony, and whether or not it should be treated as incredible because purporting to prove facts impossible," is not applicable to the evidence in the instant case. The evidence here does not purport to prove the impossible or something contrary to the great physical laws of the universe.

There are in this case more than eighty pages of evidence and we do not think that it is necessary or would serve any purpose to discuss it in detail. We have read and considered it carefully; and, applying the rules stated above we are convinced that the jury was authorized from the evidence to find the verdict of voluntary manslaughter.

The court did not err in overruling the motion for a new trial for any reason urged in such motion.

*Judgment affirmed.   Gardner and Townsend, JJ., concur.*