## 15080.   REAVES v. COLUMBUS ELECTRIC & POWER CO.

1. Where a person hires his servant to another for a particular employment, the servant, as to anything done in that particular employment, must be considered the servant of the person to whom he is hired, although he remains the general servant of the person hiring him to the other.

2. While it is true that the testimony of a party who offers himself as a witness in his own behalf is to be construed most strongly against him when it is self-contradictory, vague, or equivocal, the same rule is not applicable against a party in the construction of the testimony of other witnesses introduced by him.

3. "When a witness testifies to facts incoherently or inconsistently, that circumstance goes to his credit, and if his testimony be very incoherent or inconsistent, it should be considered with great caution" by the jury (*Evans* v. *Lipscomb*, 31 *Ga.* 71 (2)); but this rule does not authorize the court to hold, as a matter of law, that the testimony of one not a party has no probative value merely because it is incoherent, inconsistent, or self-contradictory.

4. It is "well settled in this State that a party may contradict his own witness by showing the truth to be different from what the witness testified. *Skipper* v. *State*, 59 *Ga.* 63; *Cronan* v. *Roberts*, 65 *Ga.* 678; *McElmurray* v. *Turner*, 86 *Ga.* 217." *Christian* v. *Macon Railway Co.*, 120 *Ga.* 314 (2), 317 (47 S. E. 923). "A jury in arriving at a conclusion upon disputed issues of fact may believe a part of the testimony of a witness or witnesses, and reject another part thereof, it being their duty to ascertain the truth of the case from the opinion they entertain of all the evidence submitted for their consideration." *Sappington* v. *Bell*, 115 *Ga.* 856 (1) (42 S. E. 233).

5. Where a witness testifies to a fact, the presumption is, in the absence of anything to the contrary, that he is testifying from his own knowledge.

6. Under the above rulings the plaintiff's evidence made a case for submission to the jury, and the court committed error in awarding a nonsuit.

DECIDED APRIL 23, 1924.

Action for damages; from Coweta superior court—Judge Roop. September 4, 1923.

Application for certiorari was denied by the Supreme Court.

This was an action by T. M. Reaves against the Columbus Electric & Power Company to recover damages for personal injuries. The case came to this court on exceptions to a nonsuit.

The plaintiff alleged: that while riding in an automobile upon a public highway he was injured in a collision between the automobile and a wagon in the charge of the defendant's servant; that the servant was driving a team of mules hitched to one wagon, and behind that wagon another was attached by means of a rope or chain; that the rear wagon was pulled behind the front one at a

distance of approximately twenty feet; that because the rear wagon was loosely, carelessly, and negligently hitched or tied to the front wagon, it failed to track directly behind the front one, but swerved back and forth, and that, as the vehicles were meeting, it swerved to its left and far beyond the center of the highway against the automobile in which the plaintiff was riding, causing the automobile to turn over, with the result that the plaintiff was injured. The principal question for determination by this court is whether the evidence would have authorized the inference that the driver of the team was the servant of the defendant at the time and place of the injury. The only evidence upon this question was the testimony of the driver himself, and was as follows:

"My name is Horace Goodwin. I live out here at Mr. Hulette Potts in this county. On or about the 28th of last October I remember the Columbus Electric Power folks fixing its wires, and I was hauling for the Columbus Electric & Power Company, of Columbus. I was on the wagon the night there was a lady got killed and three white gentlemen got hurt. I was driving the front team. Two white gentlemen were on the front wagon with me. . . They were tramps, two white tramps. . . I answer I was going home to Mr. Hulette Potts. I stays down here on his place about three miles and a half, I reckon, from Newnan. There was nobody else on the front wagon except me and these two white tramps. The front wagon did not have any load except we three men, no load at all. The body had a flat on it, nothing but a flat. The coupling was not full length. There was nothing else on the front wagon. It had a flat instead of a body on it. There was a flat on the hind wagon too. There was nobody on it. There was nothing but a flat on it. One of the men tied the hind wagon to the front wagon; I don't know his name. He was working for the power company, the man that tied it. The man that tied this hind wagon on to the front wagon was working for the power company. I don't know his name. He is here. In reply to the question, 'The man that tied this hind wagon onto the front wagon, was he the power company's boss man that was bossing the work?' I answer, he was going with us to show us where to put the wires. He showed them how to tie the wagon." Q. "Two of them who were working for the power company tied the wagons together, tied the hind wagon to the front wagon?" A. "Yes,

sir. Both of them were white men and both of them were working for the Columbus Electric Power Company." "In reply to the question, 'Who was the man that directed you or anybody else as to where to get the wire, where to put the wire and what to do with reference to fixing the wire for the Electric Power Company, I answer, he was going with us, I was hauling from Grantville some wire." Q. "Who was it told you where to get the wire and what to do with the wire, and how to fix it?" A. "Them power men." Q. "Two of them?" A. "Yes, sir." Q. "Were they or not the same two that tied the hind wagon to the front one?" A. "It was one of those. Two of them were there. I was there at the wagon." Q. "Now tell what these two men or either one of them said about tying the wagon behind to the front wagon." A. "He showed how to tie it, and, after he got it tied, he told me I could go home. After he tied them he told me I could go home with them, and I left to go home. Didn't anybody tell me to [go?] the way I went." "In reply to the question, 'After these men tied that wagon on to the front wagon, where did they tell you to go, how come you to go?' I answer they told me to carry the wagons in to Mr. Hulette Potts, and I was trying to do what these men told me to do at the time this accident happened. These two men that tied the hind wagon to the front wagon were the ones who ordered me what to do about the wire, where to get the wire, and where to put it with reference to doing this work for the power company. I obeyed their orders. I did everything that these two power company men instructed me to do." Q. "Going as you did up the road at the time of the accident, were you or not obeying their instructions at the time?" A. "Yes, sir." Q. "How many people work there for the power company?" A. "I had two with each wagon, run two wagons. I had four men. The other two men were along on the other wagon, the one I brought home. The other wagon left, and left us there pretty late." Q. "Left you there with the two power company men?" A. "Yes, sir." Q. "Then you had to do what these two power company men told you?" A. "Yes, sir. These power company men had me to haul wire from Grantville to Hogansville for the power company." Q. "What did they do with it?" A. "I don't know, sir." Q. "Strung it on the poles?" A. "Yes, sir." "In reply to the question as to who directed my movements and told me

what I had to do, I answer, the fellow that was with me, the power company man. Every time we would go he would go with us and show us where to get the wire and where to put it. When I was going up the road with those two wagons the lights of the automobile that collided with us were burning."

(On cross-examination.)

"Mr. Hulette Potts hired me and he paid me. He had the right, and only he had the right, to discharge me. No man connected with the power company hired me. Mr. Hulette Potts had me hired. No man connected with the power company paid me. No man connected with the power company had the right to discharge me. I was working for Mr. Potts in hauling the wire for the power company. The power company only directed me where to place the wire, and they had nothing to do with my movements after I left after hauling wire, and I went wherever Mr. Potts told me after the hauling and carried the teams to whatever place he told me." Q. "So that after you quit hauling wire for the power company, after you quit in the evening, you were under the instructions of Mr. Potts and did what he said?" A. "Yes, sir." Q. "And you obeyed his orders exclusively?" A. "Yes, sir." "In reply to the question as to what right the power company had to take me off as driver and put somebody else on Mr. Potts' wagon as driven, I answer it didn't have any right. It was on Saturday evening that the accident occurred. One of Mr. Hulette Potts' mules got hurt down there on the other side of Grantville, and after the mule got hurt word was sent to Mr. Potts about it and he came down there." Q. "And he instructed you to take those mules and carry them home?" A. "Yes, sir, that other boy he would carry the mules home, the one that got hurt, and he told me to take the other team and carry it home and tie the wagons together. I went on a little late that night. I hauled for the power company until night. It wasn't quite night, it wasn't dark when we got to Grantville, the sun was about a quarter of an hour high." "In reply to the question as to where I was working for the power company I answer, we went right near Hogansville, right at Hogansville, they turned to the right before getting to Hogansville." "In reply to the question, 'After you made the last load down there Saturday evening, were you going back any more?' I answer, no, sir; he told me not to come back

any more until he called Mr. Hulette." Q. "You were discharged finally?" A. "Yes, sir, I was not to go back until Mr. Hulette told me." Q. "After you left off hauling, the power company man discharged you for good, so far as you know?" A. "Yes, sir, he told me I need not come back unless Mr. Hulette told me. Mr. Hulette told me where to carry the teams after I was through working. I brought them home. He told me to bring them home. He instructed me that very day to bring them home that night. He told me where to carry them."

"In reply to the question, if, after I left Grantville coming up this way that Saturday evening, if I was then engaged in doing anything for the power company, I answer, no, sir, after I got off of the job I was coming home. I delivered the last load for the power company that evening about three o'clock, three or four. When I delivered the last load I was out to the right of Hogansville about five or six miles. It might have been further than that. I was not hauling anything for the power company when I got back to Grantville, I wasn't hauling, I had made my last load." "In reply to the question, 'When you got back to Grantville, were you doing anything for the power company?' I answer, no, sir, I was working until I come back to Grantville, and that is when I was told not to come back any more; they didn't need me." "In reply to the question as to what these men representing the power company said to me when I left off working down there, I answer, they just told me didn't need me any more, and they would call up Mr. Hulette whenever they wanted me. They told me they didn't need me any more unless they called up. They did not call up any more. When I left there I was not doing anything for the power company; they discharged me and I was coming home. I wasn't doing anything after I got to Grantville." "In reply to the question as to what services I was performing for the power company from Grantville up towards Newnan, I answer, not anything after they excused me down there. They excused me in Grantville. . . ." Q. "You were at that time working for whom?" A. "For the power men, but I was going in home, they excused me in Grantville. At the time of this accident I was going in home. Mr. Hulette Potts was paying me at that time." Q. "Who had the right at that time to discharge you, to turn you off?" A. "Them fellows, they turned me off that

evening." Q. "At the time of this accident, did they have any authority over you then?" A. "No, sir. Mr. Hulette Potts had been down there after the mule was hurt, he come down there after that and went on home, and he told me to bring the other wagon after the other mules got home. He told me where to carry them after I got through work, told me to bring them home, and I was obeying his orders at that time." "In reply to the question as to how far was this place of this accident from where I had been working for the power company, I answer, I was on this side of Moreland when it happened." "In reply to the question, 'You had been working that day for the power company near Hogansville?' I answer, working in Grantville, getting wire from Grantville; it was some seven or eight miles. There was no power company man on the wagon when the accident happened. I was driving. I was employed by Mr. Hulette Potts." "In reply to the question if I know that large stout man right here, if I ever saw him before, I answer, yes, I have seen him once, I don't know him. He talked to me. I didn't go behind the barn, but he did talk to me. He never offered me anything at all. . ."

"In reply to the question, 'From the time you left the barn, Mr. Potts' barn, and went with the power company to the place where these wires were to be hauled and fixed, from the time you left Mr. Potts' barn for the day's work until you came back to Mr. Potts' barn that night, who told you what to do,' I answer, the power company men." "In reply to the question, 'What requirement, if any, did the power company men have for you leaving Mr. Potts' barn at a certain time, getting down there a certain time and getting back to the barn a certain time?' I answer, yes, they told us to get there as early as we could, the power company men did. He never did say what hour." "In reply to the question as to about what hours I was expected to do this work for the power company, I answer the sun was about an hour high, a little after sunup." "In reply to the question as to what time I had to leave the barn to go to work that I had to do that day, I answer, I left home when the sun was about half hour high." "In reply to the question as to what time did I leave the work to go back to the barn at night, I answer, we worked until sundown." "In reply to the question, in order to get back to Mr. Potts, as to what time I left down there after sundown, I answer, sometimes we quit be-

fore sundown, after we made our last load, we had so many loads to make." Q. "About sundown?" A. "Yes, sir, little before sundown. We kept the mules at home at night at the barn. I can't give any idea as to how far that was from where we was doing the work. I don't know as I have any idea as to how far the barn where we kept the mules was from Newnan. We left the barn in the morning before light." Q. "Were your orders as to what hour you were to leave the barn from the power company?" A. "No, sir, Mr. Hulette told us to come soon so we wouldn't be so late down at the power company." "In reply to the question as to what time the power company required us to begin work there, I answer, sometimes we would stay late before we got off." "In reply to the question as to what time did the power company require us to be there to begin work, I answer, they did not say." "In reply to the question as to what time did they allow me to quit down there, I answer, sometimes it was before sundown. It would take us more than about an hour to go from the barn to the place where the work was done on the wire, about an hour to go and an hour to come back. We could get through soon by rushing the mules, but never did rush them." Q. "After you left Mr. Hulette's barn in the morning, who was it that gave you orders?" A. "Mr. Hulette." Q. "After you left his barn?" A. "The power company gave me orders." Q. "After you left Mr. Hulette Potts' barn in the morning until you got back to Mr. Hulette Potts' barn at night, who gave you all of your orders?" A. "The power men." Q. "Anybody else?" A. "No, sir." Q. "Nobody else?" A. "No, sir."

"In reply to the question, 'When you were working for Mr. Hulette Potts, was Mr. Hulette Potts working at telegraphing, selling automobiles or farming?' I answer, he was farming. That is all he did. He had good hands on his farm, and they plowed, and sometimes they hoed cotton or anything else in the operation of the farm. He did not have any business in the line of stringing wires or working for a telegraph or telephone company. He did nothing like that. The work I did for Mr. Potts was working on the farm. I was a general farmhand for Mr. Potts. That is the only way that he hired me. That is the only sort of contract that I had with him, just general farming, general agent of his." "In reply to the question if I carried the teams to Mr. Potts' barn

every night or staid down there, I answer I carried them back there every night. The teams were not kept in a camp down there any time, down about Grantville or Moreland, brought them back every night. We didn't camp anywhere but brought them back up here every night."

(Re-cross examination.)

"The power company gave me no orders before I reached the place where I worked for them." "In reply to the question if they gave me any orders after I left the place where I worked for them, I answer, they told me to bring the wagon home. Mr. Potts told me too to bring the wagon home, and they told me to bring the wagon home." "In reply to the question as to what direction did the power company men give me before I went to work in the morning and left that evening, I answer, they didn't give any; they told me not to come back any more unless they called up Mr. Hulette, and I didn't go back and the teams didn't go back." "In reply to the question, 'While you were hauling for the power company, did they give you any orders before you reached the work or after you left the work?' I answer, no, sir, they gave me orders after I got to the job. Those were the only orders they gave me and that was the direction to me as to where to place the wires." (Re-direct examination.) "In reply. to the question, 'I want to know who directed you to go with this wagon tied behind the other one up this road that you went, did Mr. Potts or did the power company, these two men that tied the wagon?' I answer, Mr. Hulette told me to bring it on." "In reply to the question, 'After the wagon was tied, the hind wagon was tied to the front wagon, after that was done, who directed you, what to do?' I answer, the power company. Mr. Potts was not there then." (Re-cross examination.) "In reply to the question as to what did they say, I answer they told me to carry the wagons home, told me they didn't need me any more until they called up. That was what they told me."

*Lawton Nalley, Terrell & Terrell, Post & Arnold,* for plaintiff.
*F. U. Garrard, A. S. Bradley, Hall & Jones,* for defendant.

BELL, J. (After stating the foregoing facts.) We know nothing of the scope and terms of the agreement under which Mr. Potts let his servant Horace Goodwin to the defendant power company, except as revealed in the testimony of Goodwin himself. If we

did, we might be able to hold, as a matter of law, whether he was to be treated as the servant of Potts or the servant of the defendant at the time and place in question,—that is, whether he was the servant of the defendant until he reached the situs of his general employment on Potts's farm. He was the general servant of Potts as a farm laborer. It is well settled that "the fact that an employee is the general servant of one employer does not, as matter of law, prevent him from becoming the particular servant of another, who may become liable for his acts. And it is true as a general proposition that when one person lends his servant to another for a particular employment (or hires him), the servant, for anything done in that particular employment, must be dealt with as the servant of the man to whom he is lent (or hired), although he remains the general servant of the person who lent him (or hired him)." 18 R. C. L. 784. The real test by which to determine whether a person was acting as the servant of another at the time of the infliction of an injury by him is to ascertain whether at the particular time when the injury was inflicted he was subject to the other person's orders and control, and was liable to be discharged from the particular employment for disobedience of orders or misconduct. *Brown* v. *Smith,* 86 *Ga.* 277 (12 S. E. 411, 22 Am. St. Rep. 456). "One person may be taken to have been the servant of another in respect of a given transaction, although he did not occupy that position for all purposes. In order to establish the relationship, it is merely necessary to show that he was a servant as regards the particular piece of work in which he was engaged at the time when he sustained or inflicted the injury complained of. . . The special master is alone liable to third persons for injuries caused by such wrongful acts as the special servant may commit in the course of his employment." LaBatt on Master & Servant (2d ed.), § 52.

The above propositions were applied by this court in *Greenberg* v. *Yarbrough,* 26 *Ga. App.* 544 (106 S. E. 624), wherein it was ruled that "Where a person hires his servant to another for a particular employment, the servant, for anything done in that particular employment, must be dealt with as the servant of the person to whom he is hired, although he remains the general servant of the person who hired him." As was said in that case, the principle of law is well defined. Is it applicable in the instant

case? The answer to this question must be determined according to the inference to be drawn from the testimony of the servant himself. While the jury would have been authorized to find from certain parts of his testimony that he was the servant of Potts, they could legitimately have inferred from other parts that he was the servant of the defendant.

The testimony of a party who offers himself as a witness in his own behalf is to be construed most strongly against him when it is self-contradictory, vague or equivocal. *Shepard* v. *Chappell*, 29 *Ga. App.* 6 (2) (113 S. E. 23). This rule, however, is not applicable as against a party in the construction of the testimony of other witnesses introduced by him. While the Supreme Court has said that "when a witness testifies to facts incoherently or inconsistently, that circumstance goes to his credit, and if his testimony be very incoherent or inconsistent, it should be considered with great caution" (*Evans* v. *Lipscomb*, 31 *Ga.* 71 (2)), this rule relates to the province of the jury, and this court cannot say that the testimony of one not a party has no value merely because it is incoherent, inconsistent, or self-contradictory. "It was for the jury to determine whether the testimony of the witness was so vague, indefinite, and uncertain as to be worthless, or whether the testimony—though contradictory in some respects—possessed some degree of probative value." *O'Brien* v. *Ellarbee*, 14 *Ga. App.* 333 (5). (80 S. E. 864). "The credibility of a witness is a matter to be determined by the jury under proper instructions from the court." Civil Code (1910), § 5883. See also *Holcombe* v. *State*, 5 *Ga. App.* 47 (6) (62 S. E. 647); *Marshall* v. *Woodbury Banking Co.*, 8 *Ga. App.* 221 (68 S. E. 957); *Borders* v. *City of Macon*, 18 *Ga. App.* 333 (2) (89 S. E. 451). This court is without jurisdiction to adjudge that testimony is worthless because of the "witness's manner of testifying." Civil Code (1910), § 5732. See *Shearman* v. *Stephens*, 30 *Ga. App.* 509 (4) (118 S. E. 567).

It is true that hearsay evidence has no probative value, even if admitted (*Eastlick* v. *Southern Railway Co.*, 116 *Ga.* 48, 42 S. E. 499), and consequently true also that where a witness testifies to certain facts upon his direct examination, but upon cross-examination shows that he has answered from hearsay and without any personal knowledge of the facts about which he testified, his testimony should be disregarded (*Atlantic Coast Line R. Co.* v. *Col-*

*lins,* 13 *Ga. App.* 759 (1), 79 S. E. 946) ; compare *Evans* v. *Josephine Mills,* 119 *Ga.* 448 (2), 46 S. E. 674; *Evans* v. *Scofield's Sons Co.,* 120 *Ga.* 961, 48 S. E. 358) ; but it is furthermore the rule that "where a witness testifies to a fact, the presumption is, in the absence of anything to the contrary, that he is testifying from his own knowledge." *Shaw* v. *Jones,* 133 *Ga.* 446 (3) (66 S. E. 240) ; *Hearn* v. *Red Devil Co.,* 31 *Ga. App.* 84 (119 S. E. 469).

The testimony of the witness Goodwin does not affirmatively disclose that he was testifying from hearsay; and although in truth he may not have known anything as to whose servant he was, this court cannot say, as a matter of law, that he was not testifying from personal knowledge of the terms of the contract which he may have heard made, or from subsequent conversations between the contracting parties, or from the practice and course of dealing between them with respect to the direction and control of his labor. See *New Amsterdam Casualty Co.* v. *Sumrell,* 30 *Ga. App.* 682 (118 S. E. 786).

We conclude that it should not be held, as a matter of law, that Goodwin was not the servant of the defendant at the time and place of the plaintiff's injury, but that the question was one to be determined by the jury.

The witness, with more certainty than in some other particulars, testified that he was carrying the second wagon at the orders of representatives of the defendant under whom he worked, one of them either fastening this wagon or having it fastened in the manner complained of. He gave other testimony not quoted in the statement of facts, which, if true, would have shown that the averments of the plaintiff as to negligence were unfounded; but this still did not authorize the granting of a nonsuit, for the reason that the testimony of the plaintiff himself, together with that of other witnesses, would have warranted the inference of negligence as alleged.

It is "well settled in this State that a party may contradict his own witness by showing the truth to be different from what the witness testified. *Skipper* v. *State,* 59 *Ga.* 63; *Cronan* v. *Roberts,* 65 *Ga.* 678; *McElmurray* v. *Turner,* 86 *Ga.* 217." *Christian* v. *Macon Ry. Co.,* 120 *Ga.* 314 (2), 317 (47 S. E. 923). "While a party will not be permitted to impeach a witness called by him,

by proof of general bad character, or by proof of contradictory statements, unless it appears that he has been entrapped by the witness, he is not bound, by calling the witness, to accept his testimony as true, but may prove by another witness a different state of facts." *Moultrie Repair Co.* v. *Hill,* 120 *Ga.* 730 (3) (48 S. E. 143). See also *Carter* v. *Carter,* 7 *Ga. App.* 216 (66 S. E. 630). And see *Sizer* v. *Melton,* 129 *Ga.* 143 (3) (4) (58 S. E. 1055). "A jury in arriving at a conclusion upon disputed issues of fact may believe a part of the testimony of a witness or witnesses, and reject another part thereof, it being their duty to ascertain the truth of the case from the opinion they entertain of all the evidence submitted for their consideration." *Sappington* v. *Bell,* 115 *Ga.* 856 (1) (42 S. E. 233).

The plaintiff's evidence was sufficient for the submission of his case to the jury, and the nonsuit was error. See *Steinhauser* v. *Savannah &c. Ry. Co.,* 118 *Ga.* 195 (1) (44 S. E. 800).

Nothing herein ruled is in conflict with *Coggin* v. *Central Railroad Co.,* 62 *Ga.* 685.

*Judgment reversed. Jenkins, P. J., and Stephens, J., concur.*