28857. LIBERTY MUTUAL INSURANCE COMPANY *et al. v.* KINSEY *et al.*

DECIDED MAY 8, 1941. REHEARING DENIED JULY 25, 1941.

*Neely, Marshall & Greene,* for plaintiff in error.

*T. Elton Drake, Ben H. Berry, Herman Talmadge, Edward B. Lovell,* contra.

SUTTON, J. J. R. Kinsey filed with the Industrial Board his claim for workmen's compensation against R. H. Ragan Plumbing & Heating Company and National Fruit Products Company, as employers, and Liberty Mutual Insurance Company, as insurance carrier. The full board affirmed the finding of facts and award by the single director in favor of the claimant against the National Fruit Products Company and the insurance carrier. The superior court affirmed the award of the full board, and the exception here is to that judgment, the plaintiffs in error contending that the evidence demanded a finding that the claimant was, at the time of his injury, in the exclusive employ of the plumbing company, an independent contractor, and also contending that even if the National Fruit Products Company was liable the claimant should have been required to exhaust his rights against the plumbing company before proceeding against the former.

From a careful examination of the voluminous evidence we are of the opinion that the finding of facts and the award were fully authorized. It appears that National Fruit Products Company arranged with a construction company of Philadelphia to erect for it in Atlanta a certain building or plant, before the completion of which it was necessary that certain machinery, piping, and various connections be installed. This work was so highly specialized and intricate that it could not be done by an ordinary skilled steam-

fitter, and the company engineer, E. R. Lindstrom, and his assistant, C. W. Gantt, were placed in charge of such matters. In placing the machinery in the building various pipes had to be run and necessary connections made between the plant machinery. Lindstrom, acting for the company, had on several occasions used the services of R. H. Ragan Plumbing & Heating Company in other work. In connection with the running of pipes, making connections, etc. in the new building Lindstrom sought out Ragan, and they entered into an informal agreement whereby Ragan, operating as R. H. Ragan Plumbing & Heating Company, was to supply the company with competent labor for running the pipes, making connections, etc. The bulk of the material to be used in connection with such work had already been arranged for by the company, but it was explained to Ragan that from time to time some material not otherwise provided for was to be furnished by him. It does not appear that there was any express agreement as to what Ragan was to receive for his services, but it seems to have been taken for granted, from previous experiences between the parties, that at the completion of whatever was to be done by Ragan he would be paid or reimbursed for the actual cost of the labor and materials sustained by him, plus a reasonable amount for overhead and profit. Lindstrom, being desirous of having the work done by skillful steamfitters, free from any labor disputes or trouble of any kind, being unacquainted with the labor situation in Atlanta, and having full confidence in the ability and character of Ragan and his knowledge of and capacity for selection of men who might reasonably be expected to proceed with the work and bring it to a conclusion in a manner satisfactory to the company, relied upon him to furnish the requisite number of suitable and competent steamfitters. No stipulation was made as to wages to be paid, but it appears from the evidence that union prices had already been established for such work. The exact processes of the work not being accurately or definitely determinable in advance, and no steamfitter being able to execute it unaided by directions of the engineer or his assistant, no written plans or specifications were submitted to Ragan, but he was taken over the entire plant and by Lindstrom was shown the nature of the work to be performed and was told that the company's plans would probably be changed from time to time and he would be made acquainted at intervals with the va-

rious details of the work. He was advised that Lindstrom was to have supervision and control of the work, and he did assume such direction when the work was begun. Ragan would daily go to the plant and spend a short while there, and Lindstrom would explain to him the forthcoming processes of installation, the work to be done, and where to be performed. When Ragan was not present during the progress of the work Lindstrom would instruct the employees directly where to work and what to do, and would sometimes transfer an employee from one special job or function to another. It appears that from the unusual nature of the installation, piping, connections, etc., the completion of the work was undeterminable, and that whatever Ragan had been engaged to do, or any employee sent by him engaged to do, the termination of the services was to be at the will of the company.

Among the steamfitters sent to the job by Ragan was J. R. Kinsey, the claimant. At the time Ragan negotiated with Lindstrom Kinsey was employed by Ragan as a steamfitter in an ice cream plant being erected by other parties in Atlanta. While in the performance of his duties on September 28, 1939, at the plant of the National Fruit Products Company he sustained a serious accidental injury which immediately resulted in total disability for which his claim was filed. He testified in part that Lindstrom or Gantt gave him orders what to do, and that when he was sent to the job Ragan told him that Lindstrom or Gantt would give him instructions what to do, but that Ragan would probably tell the ones sent there something to do, and would say, "If you want anything to do, ask Mr. Lindstrom or Mr. Gantt either one, and they will tell you what to do and how to do it and all about it;" that one or the other would instruct him in the work he was doing, and that they would require him to leave some work that Ragan had put him on and do some other job; that at one time he was required to change a water line that he had already started along some tanks, made to take it down and put it up in a different way; that, as he recalls, Mr. Lindstrom did that; that when he needed more material or a different material he would go to Mr. Lindstrom and he would order it, and the witness went to him because Ragan had told him to see Lindstrom in such cases; that he was never told how much work was to be done at the plant; that Ragan gave him no such information when he was sent to the plant; that the only thing Ragan

told him as to what he was to do at the plant was that Ragan said he would come out there practically every morning, and that he would go to Lindstrom who would explain to Ragan what he wanted done, and then Ragan would tell the employees he had sent there, saying "If you give out of this, if you give out of what you are doing, go to Mr. Lindstrom or Mr. Gantt and they will tell you what to do;" that Ragan told him that if Lindstrom or Gantt wanted him to change any of the work or do it differently or leave it and go to something else, to follow their instructions; that he would have to follow their instructions because a vinegar plant was new to him and neither he nor Ragan knew exactly "how it went;" that he did not have any plans or any diagram or written orders of the work that was to be done; that the first morning he went out to the plant Mr. Gantt showed him what to do, and Ragan in the meantime told him, "If Mr. Lindstrom or Mr. Gantt either one want you to do anything else, you do what they say do;" that he was paid $1.25 per hour, which under union regulations is the minimum at which he may work, and Ragan paid him; that one time he was running a water line back along some tanks and Lindstrom said he was fixing to run it underneath the floor and to run it on top of some beams there; that another time he was taken off of a water line and put on one that came up from the pump and ran up a hill and cut across a building; that he was out there on that job to take instructions from Lindstrom and Gantt if they desired to give them to him, and that he could not have gone ahead without instructions, and the work was of a special kind which needed expert supervision, and Mr. Lindstrom was the man everybody on the job looked to for instructions as to what to do and how to do it.

R. H. Ragan testified, that he was employed by the National Fruit Products Company to do different things, did not know just what he had to do himself, plumbing, general pipe work, alcohol lines, water lines, and steam lines; that he just had an oral understanding that he would go out there and do the job as cheaply as he could; that the company did not know just what was to be done, having no plans and specifications, and as the equipment would come in the work would be done; that he was informed that if he was not present and Lindstrom or Gantt wanted something changed they would instruct his men how to do the work, and at the time the men were sent out it was understood that the work had to be

done according to the way Lindstrom and Gantt wanted it done rather than according to any contract he had, and he did not know what he had to do; that during the whole time they instructed his men how to do the work and where to put it and when to do it; that if they wanted to have him taken off of the job any men they did not, for any reason, want to work out there all they had to do was to say the word, and that they had the right to instruct his men to work overtime on the job if it was necessary, and had the right to require him to furnish more men or withdraw them from the job for a while; that there was no specified time within which he was to do any kind of work there, and he did not know until the job was completed just what the men had to do on the job; that as to Lindstrom or Gantt telling him exactly what was expected of him and his men on the job, no more than that they expected good men and men who could do the job right; that at the time he took the job Lindstrom told him he would instruct his men just how he wanted things put up if he was not there, and if he was there Lindstrom would instruct him to tell the men to do the work in a certain way; that even if there remained lots to do Lindstrom could stop the men at any time and suspend them from the job; that Lindstrom said he bought quite a lot of pipes, special valves, fittings, and odds and ends, and the witness would get for them what was short; that he was to furnish only some small things, some piping, special connections, and valves that might be needed; that he hired Mr. Kinsey to work on the National Fruit Products Company job and paid him in cash every week $1.25 per hour, the union scale; that the witness would go out on the job practically every morning but did not stay any longer than he had to, sometimes an hour, sometimes an hour and a half, and sometimes three hours, his purpose being to see Mr. Lindstrom and check over with him the equipment that was there, to see if it would fit his plans and if it would work, going over it at the request of Lindstrom, and he did the work like Lindstrom wanted it done; that Lindstrom would give him instructions and he would pass them on, and he told Lindstrom that, if he was not there, to give them to the men, and, if it was necessary in an emergency and he paid them a good price, he authorized Lindstrom to work them overtime; that as to whether he told Lindstrom he could take the men off of the job the witness had put them on and put them

on another job, he could do anything he wanted to do; that if Lindstrom wanted to pay the price he would have the right to tell a steamfitter and plumber to sweep the floor and cease doing plumbing and heating work; that as to authorizing Lindstrom to take the claimant from one job and put him on another, if he needed him on steam fitting and pipe work, yes; that if Lindstrom or Gantt wanted the men to work overtime they could have ordered it and it would have been done; that the witness was employed to put the men out there as they were needed and carry the work on so it would not be delayed.

R. R. Speer testified that he worked on the same job with Kinsey and was put there by R. H. Ragan, who told him as to anything he was not familiar with he would take instructions thereon from Lindstrom or Gantt; that he told him he did not understand the job completely and to do anything Lindstrom or Gantt asked him to do, there being no plans for the job, and Lindstrom and Gantt showed him just exactly how they wanted the work done; that they changed him around a little bit; that Lindstrom or Gantt at times took him from work he had been put on by Ragan and put him on something else; that Lindstrom or Gantt showed him just how they wanted the pipes to come into the building and where they wanted them to go, what size pipe they wanted to run at a particular place, and where to place the valves; that he looked on Ragan as being his boss and was paid by him, was told by him to go out there and work, and after he got there if Ragan was not there and some question arose about which he was in doubt he would talk to Lindstrom or Gantt and they would tell him how the work was to be done; that on any particular day if Lindstrom told him not to do anything else but to go away and come back the next day or next week he would have done whatever he said do, and he understood that he was out there to do the job as they wanted it done, Lindstrom or Gantt.

E. R. Lindstrom testified that he was in charge of the installation of the equipment in the building of National Fruit Products Company and let out the plumbing and heating part to R. H. Ragan on a time and material basis; that the technical character of the business was such that it was almost impossible to give out any plans because they change from time to time in the processes, and Ragan was to be allowed twenty per cent. on labor and material as

overhead and an additional profit of five per cent. on the total; that the company, because of the union conditions which they encounter, did not have any plumbers or pipe fitters on the job and they did not select any of the men sent out by Ragan; that they went into detail with Ragan as to the manner of putting in the equipment, because it is highly technical and the work constructed in such a way that no pipe fitter or plumber in the industrial fields understands it; that they could not expect Ragan to go ahead and execute the work without the direction and supervision of somebody working with it every day; that the supervising included instructions as to how the equipment was to be hooked up and where it should be placed; that what Ragan did was entirely up to him as long as he did the work according to the regulations common to good workmanship; that he explained to him that as the work went on it might be necessary to make such changes, but that he did not stand over his men and regulate the manner and details of their work, did not undertake to fix their pay or regulate their hours of work, and so far as he knew there was no overtime on the job; that as to recalling any instance when he gave specific instructions to the men, a tank was to be sealed inside and a man did not know whether it was to be placed against the wall, not allowing for sealing, or removed from the wall in order to allow sealing; that he gave him instructions and told him to go ahead and disregard all sealing, those being technical things which no one but himself could answer; that if he felt a man was not doing his work properly he did not have authority to discharge him, but would have complained to Ragan and requested that the work be put in as it should be, and how Ragan did it was up to him, and if Ragan did not see that the work was done properly the only thing the company could do was to cancel his contract; as to whether or not on one occasion he had Kinsey to change a water line, they gave him full jurisdiction over his work as long as he accomplished the results between two points, and that, if they found he was going to run it underground and there were certain obstacles in the way, they would instruct Ragan it should go overhead and would point out the obstacles; that during the time the men were out there he did not undertake to direct them as to the hours they should work, the rate of pay they should receive, or the manner in which they should perform the details of their work; that from time to time

and day by day he would instruct Ragan as to just exactly the manner in which he wanted the work put in place; that if from any cause he wanted the work stopped he thought he could have required Ragan to stop it; that if a man's work was not satisfactory he would go to Ragan and not bring the man into it and it was up to Ragan to adjust the matter and, if necessary, the work would be replaced.

C. W. Gantt testified that he supervised the inside construction tanks; that he did not exercise any control over the men sent out by Ragan and none ever came to him to ask for specific instructions about the work, but at intervals he was asked about how a line should be run, but after telling him he did not direct him to "screw the nut this way" or to "turn the bolt that way;" that he never gave Kinsey any instructions how he should perform the details of his work and never undertook to take a man off of one job and put him on another.

It was shown that upon the completion of Ragan's services he was paid a sum which was the amount of the wages of the men paid by him and the price of certain material which he furnished, plus an overhead charge of twenty per cent. and a charge of five per cent. as profit.

"Under the Georgia statute and decisions, the test to be applied in determining whether the relationship of the parties under a contract for the performance of labor is that of employer and servant, or that of employer and independent contractor, lies in whether the contract gives, or the employer assumes, the right to control the time, manner, and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract." *Yearwood* v. *Peabody,* 45 *Ga. App.* 451 (2) (164 S. E. 901). See also *Cooper* v. *Dixie Construction Co.,* 45 *Ga. App.* 420, 425 (165 S. E. 152); *Bentley* v. *Jones,* 48 *Ga. App.* 587, 590 (173 S. E. 741). If Ragan was an independent contractor and Kinsey was in his employ, National Fruit Products Company would not be liable for the compensation claimed. If, however, Kinsey was the special employee of National Fruit Products Company, although generally the employee of Ragan at the time he entered upon his duties at the plant, the injuries sustained by him would be compensable by the National Fruit Products Company. "Under general legal principles, it is well settled that the

fact an employee is the general servant of one employer does not prevent him from becoming the particular servant of another under special circumstances, and it is true, as a general proposition, that when one person lends or hires his servant to another for a particular employment, the servant, as to anything done in such employment, must be dealt with as the servant of the person to whom he is lent or hired, although he remains the general servant of the other person. In actions at common law, to recover damages alleged to have been caused by the servant of the defendant, the criterion by which to determine whether the relation existed as alleged is to ascertain whether, at the time of the injury, the alleged servant was subject to the defendant's orders and control and was liable to be discharged by him for disobedience to orders or for misconduct. *Brown* v. *Smith,* 86 *Ga.* 274 (12 S. E. 411, 22 Am. St. R. 456) ; *Reaves* v. *Georgia Power Co.,* 32 *Ga. App.* 140, 148 (122 S. E. 824) ; *Quinan* v. *Standard Fuel Co.,* 25 *Ga. App.* 47 (102 S. E. 543) ; *Greenberg & Bond Co.* v. *Yarbrough,* 26 *Ga. App.* 544 (106 S. E. 624). The same rules have been held to be applicable in determining the existence or nonexistence of the relation of employer and employee in cases arising under compensation acts. *U. S. Fidelity &c. Co.* v. *Corbett,* 31 *Ga. App.* 7 (119 S. E. 921); *Zurich &c. Ins. Co.* v. *Lee,* 36 *Ga. App.* 248 (136 S. E. 173)." *United States Fidelity &c. Co.* v. *Stapleton,* 37 *Ga. App.* 707, 710 (141 S. E. 506). In respect to the contention of the plaintiff in error that Kinsey at all times remained the employee of Ragan, it is pertinent to examine the evidence as to the particular capacity in which Ragan dealt with the National Fruit Products Company in sending Kinsey to them. While it is readily apparent that Ragan was the general employer of the claimant, we think that a finding was authorized that the claimant was, at the time of his injury, the special servant of the National Fruit Products Company, and that Ragan was not, in the enterprise, an independent contractor, but was acting as the agent of that company in furnishing or obtaining for it certain skilled labor and incidentally supplying some needed material.

It is fairly inferable from the evidence that Ragan could not possibly complete, from his own knowledge and experience, or that of those he sent to the plant, the matter of piping, connections, etc., necessary to the installation of certain machinery and equipment.

The highly specialized nature of the work required direction and supervision by those having intimate experience with the particular processes incident to such installation. Lindstrom, the company's engineer, was placed in charge and Ragan was so advised. No plans or specifications were furnished Ragan. No exact task was assigned him. He was informed that the general plan of installation might from necessity be changed from time to time, and that the date of completion of the work could not be foretold. Being unacquainted with the labor supply in Atlanta, and wishing to avoid any conflict or labor trouble with unions, and knowing that Ragan was capable of supplying the company with the skilled labor which might best serve its purpose, Lindstrom, acting on behalf of his company, arranged with Ragan to furnish the requisite men. In addition, he told Ragan that while they had arranged for the bulk of the necessary material, some additional items might be needed, and that they would want him to procure them. Ragan had been of certain service to them in the past, and without entering into any precise agreement it seems to have been understood between them that he would profit from the engagement, and that generally one doing what Ragan was supposed to do for the company, furnishing the requisite skilled labor and supplemental material and giving certain supervision to the men, would be allowed, in addition to the price of the labor and material furnished, an overhead of twenty per cent. and an extra "profit" or compensation of five per cent. Ragan paid each week the wages of those he sent to the plant, and while such a circumstance may corroborate other facts which might indicate employment under an independent contractor, it is well settled that such payment is not of itself conclusive. It is shown by the evidence that Ragan was reimbursed at the exact figures of total wages paid, as well as for the material purchased by him, and that he was allowed the usual overhead of twenty per cent. and, as "profit," five per cent. of the total. Ragan spent from one to three hours practically every day at the plant. With Lindstrom he went over the proposed work for the day and from him received instructions for communication to the steamfitters as to the manner in which their work should be done. The Industrial Board might well find that in these matters he was merely acting as the agent of the company and not as an independent contractor, and, from the evidence we have set forth above,

to further find that in his absence the company not only reserved the right to control, but in several instances did control, the time, manner, and method of the work of the employees. It is a reasonable inference that whether they remained on a particular assignment of work or not was determined by the company, and that, if it had desired the discharge of one or more of the men and had communicated that desire to Ragan and he had not complied with it, the company was at liberty to terminate the services of Ragan and all of the employees that he had procured. In short, it is a fair inference from the record that Ragan was merely an employing agent of the company, incidentally furnishing some material not convenient for the company to obtain, and that through him or directly the company reserved the right to control, and on occasions did control, the time, manner, and method of the work being done by those whom Ragan had engaged.

The contention that Kinsey should be required to first exhaust his rights against Ragan is without merit for the reason that a finding was authorized that, at the time of his injury, he was the special employee of the National Fruit Products Company, and for the further reason that the record conclusively shows that at no time did Ragan have in his employ as many as ten, and hence, was not subject to the payment of a compensation claim.

It follows from what is said above that the superior court did not err in affirming the award of the Industrial Board, which affirmed the award of the single director granting compensation to the claimant as against the National Fruit Products Company and the insurance carrier.

*Judgment affirmed. Stephens, P. J., and Felton, J., concur.*