The evidence supports the verdict. The exception to the charge is not well taken.
 DECIDED MARCH 15, 1946. REHEARING DENIED MARCH 29, 1946.
Jane Brackett sued Southern Railway Company in the superior court of Whitfield County for damages as a result of a collision between a train of the Southern Railway Company and her automobile. She claimed damages for injuries to her car and for personal injuries. The jury found a verdict in favor of the plaintiff. The motion of the railway company for a new trial was overruled, and it excepted.
The plaintiff testified: "I am Jane Brackett, the plaintiff in this case. Yes, my automobile was hit by a Southern Railroad *Page 649 
train. That was July 23, 1943. As to how this happened — well, my car was parked at the side of the shop, and I started to lunch, and I couldn't drive out that way, and I went up above the crossing to turn around above the railroad; I looked south, wasn't a train anywhere, and I looked up the track north, up both tracks, wasn't a train there, so I speeded up and started on across the track, and about the time I started and about the time I saw this train Mr. Pease throwed up his hand but I was already on the track, I couldn't stop there and back up, I put on the gas, tried to get across, and the train seemed to be coming awfully fast, and it hit the back of the car before I could get across. As to how far my car was knocked by the train; well, I don't know how many feet it was knocked, up above the railroad; I was going west, and it was turned almost around when it stopped, I don't know how far it knocked it. . . As to whether or not I am totally deaf, well, I can hear some people, I can hear noises and things of that kind; I can hear people, the noises they make, I can't understand people as well as I hear noises, I can hear noises well. As to whether or not I can hear a train whistle if it is close to me — well, I hear down at the shop all of the time, I hear them from the shop all the time. When I was hurt I didn't hear that train blow."
On cross-examination, she testified: "I had just started across the track when I saw the train. As to whether or not I speeded up my car then well, I slowed down to look down the track; when I didn't see a train on either track, I started on across, I couldn't say how fast I was going. As to how far I can see down the track from a point fifteen feet east of the main line well, I could see all the way down [to the curve in the track which was about a quarter of a mile away]. If I had merely turned my head south when I was fifteen feet from the track, as to whether or not I could have seen the train — well, I don't know how far I could see fifteen feet; I could see all the way down the track after I got close enough to look up and down, I looked up and down, I started on across, and I was too close to stop when I saw the train. When I was as close to that track as that calendar over there, as to whether or not I looked down the tracks — well, yes, you could see down the tracks; I don't know how close I was, I just looked when I got close enough to the railroad track; if the train had been on the track when I looked, I wouldn't have gone on across, *Page 650 
wasn't no train on either track when I started on across, it was too late to stop when I saw the train. If I had looked when I was as close to the track as that calendar, as to whether or not I could have seen the train — well, I guess I could if it had been coming, if it had been around the curve I could. I don't know that it is a quarter of a mile from the crossing to the curve [other witnesses testified that it was a quarter of a mile to the curve]. . . If I could have stopped, I would have before I got on the track. As to whether or not I tried to stop before I got on the track — no, I didn't see a train coming, I didn't think there was any need to stop; I just saw it coming after I started across. As to why I didn't see the train coming — well, it wasn't around the curve when I looked, I reckon, it wasn't there. If it had been around the curve when I looked down that way, I could have seen it, of course. As to where I was at the last time I looked south — well, I saw the train coming toward me while I was in the middle of the track, I guess. As to where I was when I looked south before I got on the track — well, after I looked south and I started on across, and I saw the train coming after I had started on across. As to where I was when I looked south before I got on the track — well, I don't know, I was coming toward the track, I wasn't very far from the railroad tracks when I looked down there, I looked down that way and up the other two tracks, then I started across, and the train was coming around the curve just as I started across. As to how far the train was from me when I first saw it — well, when I first saw it, it was coming around the curve, saw the engine. As to whether or not I saw the engine coming around the curve when I first saw it — well, I saw the train coming too. I was on the track when I saw the engine coming around the curve, I was already on the track, couldn't stop, I couldn't back up, so I tried to get across. . . As to whether or not I saw Mr. Jim Pease waving his hand well, he didn't wave his hand, he throwed his hand up in the door, he run to the door, I saw him in the door; he put his hand up like that when I saw the train coming, but I couldn't stop, it was too late; I saw him and the train about the same time; I just turned my head on time to see both of them, it was too late to stop. As to whether or not he run out to the crossing before the train hit my car — well, after that I was trying to get across instead of getting hit, *Page 651 
and there was a lot of other people out there, I didn't notice him. As to whether or not I didn't notice Mr. Pease run up to the street — well, there were just lots of people around there, I didn't pay any special attention."
Dr. Brackett, father of the plaintiff, testified in part: "I was sitting in front of my office not over 125 feet from where the accident occurred. . . Yes, Jane's hearing is impaired; that impairment has been present some ten years, I guess. As to whether or not she is totally deaf — well, not totally, she gets some sounds. . . I tell you the way I know she would hear, she would speak sometimes to me about the train coming when she was in the office [which was about 125 feet from the railroad crossing in question]. . . From my vantage point there, as to whether or not I would say the speed of the train was slackened any immediately before it crossed over this road crossing and hit my daughter's car — well, I don't think so, no."
On cross-examination, Dr. Brackett testified in part: "I saw Jim Pease run out of the station and wave at her; well, yes, I saw him come out about the time she had speeded up to go across. As to how far she was from the track when I saw Mr. Pease waving at her — well, she was right up on the track, somewhere about the main track. There are three tracks there, the main track is in the center, there is a siding on the east and a siding on the west. When I saw Jim Pease waving at her, I think she had already got on the sidetrack, right up at the track, maybe her front wheels on it about the center track. As to how far she was from the track when she speeded up her car — well, she was right about speeded up — well, I could see the car when she speeded up to go across. As to whether or not it shot right on across the track — well, yes, it went across the track fast, if it hadn't gone across fast she would have gotten killed. As to whether or not I said that one approaching that crossing from the east could see about a quarter of a mile down the track as they got near the track — well, when you get up right at the track you can see down there after you go by all the obstructions. As to whether or not you could see down the track a quarter of a mile before you get to the side track — well, right up at the edge of the track you can probably see down four hundred yards. As to whether or not I mean *Page 652 
that the edge of the easterly track you could see a quarter of a mile down the track — well, something like that I guess. . . Going at the speed she was, as to how far she would have had to run in order to stop — well, I don't know; she could have stopped in a short distance at ten miles an hour, in six or eight feet. . . As to how close Jane would have had to have been to the crossing in order for the engineer to have seen her — well, she would be, well, see her by the time she struck the side track, when her front wheels struck the sidetrack. At the time she reached that point, as to whether or not she could have seen the train if she looked that merely turned her head to the south when her front wheels touched the side track — well, yes, by looking that way, but she looked that way first and then looked north and didn't look back [there were obstructions of vines, etc., which obstructed the view of the train as it approached the plaintiff]. . . As to whether or not Jane's car was on this sidetrack at the time when she speeded up — well, it was about the edge of the main line, somewhere on or at the main line."
Ernest King, who saw the train when it struck the plaintiff's car, testified: That he did not hear the whistle blow, and as far as he was able to say, it could or could not have blown; that he didn't hear the brakes screeching or anything that would indicate that the brakes were being applied; that he could not say whether or not the train slackened speed before approaching the crossing; that, in order to see as far as the curve in question from the road along which the plaintiff was approaching the crossing, she would have to be about eight feet from the track, due to obstructions in the line of vision from the road to the curve; and that when he first saw her she might have been fifteen feet, but not more than twenty feet from the main line. He also testified: "I was in front of the depot when I first saw Miss Brackett before the accident. I had been in the office to see Mr. Jim Pease. As to what first attracted my attention to the fact that Miss Brackett was approaching the railroad crossing — well, Mr. Pease jumped up and said something, I forgot just what he said, and run out the door, I wondered what he was doing that for, I went out to see what he was going out for, and right then was the first time I saw her. Yes, she was there at the crossing then. Yes, the train was close by then, right in front of the depot when I got out *Page 653 
there, when I first saw it. I guess I had been at the depot with Mr. Pease about two minutes before he ran out. When I came in the office, Mr. Pease was busy and he was doing something, but I don't know what he was doing. Before he ran out, as to whether or not he operated any lever or anything on the wall — well, he reached up and got a lever, pulled it down like that (indicating). Yes, that was about the time that he said something. I don't remember just exactly what he said."
Jim Pease, the station agent, sworn for the defendant, testified in part: "Dr. Brackett moved about one car length westward, which gave an opening for Miss Jane to move out into the main highway, and as I pulled this train-order signal Miss Jane moved toward the main highway as the signal Miss Jane moved the signal, I seen the train; and as I cut my eyes back there, her car come around the doctor's car and headed toward the railroad crossing, and I knew that she had difficulty in hearing, and was headed toward the railroad crossing; I rushed out of the depot and up to the side of the railroad crossing, in the middle of the road, but to the side of it, what you would call the shoulder of the road, and down that way (indicating) to see if I could stop her; and her car was I would say about sixty-five or seventy feet from the crossing, and as I made my motion this way with my hand to stay back and not cross, her car accelerated faster instead of stopping, and the train come on and hit the car on the lefthand side."
On cross-examination, Pease testified in part: "The main-line track from the crossing [south] is straight up to a distance I would say close, you can see down it a quarter of a mile. As to how far the train was south of the crossing when it blowed for that semaphore board — well, as I pulled the board, I could just see the nose of the engine, pilot or front of it around this curve, which would be a distance of about a quarter of a mile. If that engineer had started applying his brakes soon as he rounded that curve and as soon as I pulled the board, as to whether or not he could have stopped before he came up to the crossing — well, now I don't know about the braking power of an engine, you would have to get somebody who was a technician along that line. This was a four-car train."
1. The movant specifies as erroneous the following charge — "I charge you, gentlemen, in that connection, if you find that Pease was not the operator of the train, yet he owed to the plaintiff due care, such as an ordinary prudent person would have exercised under similar circumstances when he discovered her peril, if he did discover her peril, and as to whether or not he exercised due care for the safety of the plaintiff in this case, is purely a question for your determination, and you will be governed in deciding that question, gentlemen, by determining what an ordinarily prudent person would have done for the protection of the plaintiff under the same or similar circumstances" — on the grounds that: "(a) said instruction was unsupported by the evidence; (b) it was confusing to the jury; (c) it was misleading to the jury; (d) it authorized the jury to predicate its verdict against movant upon the conduct of movant's station agent, who at such time and place breached no duty owing to the plaintiff; (e) it submitted to the jury an issue not raised by the evidence; (f) it authorized a recovery for failure to direct and employ a signalling device not designed for use in protecting crossings and the use of which was for train orders only."
If the defendant wished an elaboration on the charge, it should have requested it. The exercise of due care is required of a railroad company acting through its employees and agents to avoid injuring a person crossing the tracks of such company at a public crossing; and it is likewise the duty of the person crossing a railroad track at a public crossing to use ordinary care to avoid injury. The fact that it was the duty of Pease, the employee and agent of the railroad company, to operate the semaphore which was installed to signal train orders, etc., does not signify that Pease, the employee and agent of the railroad company, could allow a train to injure a person crossing the tracks at a public crossing, if he could, as the agent of the company, have avoided it by the use of due care in the use of the semaphore or any other available means, even though it was not his specific duty to use the semaphore to avoid injuries to persons crossing the tracks at the public crossing in question. 3 Blashfield's Cyclopedia of Automobile Law and Practice, 333 (30).
The defendant relies very strongly upon the cases of Centralof Georgia Railway Company v. Griffin, 35 Ga. App. 161 (132 S.E. *Page 655 
255), and Huckabee v. Grace, 48 Ga. App. 621
(173 S.E. 744). The Griffin case was based upon a statutory duty, and it was there held that, if the injured person was not one upon whom the duty prescribed by the statute could operate, of course no statute had been violated. And in the Huckabee case this court quoted with approval the following: "`To constitute an act of omission the foundation of an action of law, it must appear that a duty was due by the actor to the person claiming to have been injured by the act. The rule of reasonable care necessarily
includes two persons or one person and some right or property of another. It is a rule of relation. If there is no relation, there is nothing upon which the rule can operate. The rule of reasonable care under the circumstances could not limit the conduct of Robinson Crusoe as he was first situated. But as soon as he saw the tracks in the sand, the rule began to have vitality. He then had notice that there might be other persons on the island, and this knowledge of their presence made it his duty as a reasonable man to use reasonable care to the end that no act of his should injure them. Unless and until one is brought into relation with other men, or property, or rights, he has no obligation to act with reference to them, and this is true whether the obligation be called legal, moral, or reasonable.'" And so in this case, if Pease had been in the depot and operated the semaphore from his office, and had not seen the plaintiff approaching the railroad tracks under the circumstances stated, and had operated the semaphore without reference to the plaintiff crossing the railroad tracks at a frequently used public crossing, the rule of reasonable or ordinary care could not have limited the conduct of Pease as he was then situated, just as "the rule of reasonable care under the circumstances could not limit the conduct of Robinson Crusoe as he was first situated." The plaintiff does not contend that Pease should keep a regular or permanent watchout for persons crossing at the public crossing in question.
In the operation of the semaphore, Pease's duty was not general in the sense that he owed a duty to everybody who passed over the public crossing to slow up or stop the train in order to let them pass or to avoid a collision. But in the instant case the jury could have found that Pease did not owe the plaintiff any duty under any statute or any specific rule of the railroad company *Page 656 
which related to the operation of the semaphore or that he did not owe the plaintiff any duty under any specific rule of the railroad company; but that he did, as an employee of the railroad company, under the general principle of the common law, owe her a duty, by reason of her peculiar position under the stated circumstances, not to stand by and fail to use the available means which if used in the exercise of due care would have prevented the injury. Of course a railroad company can act only through its agents. In Pollard v. Weeks, 60 Ga. App. 664,672 (4 S.E.2d 722), cited by the defendant in its motion for a rehearing, it is stated that "whether or not an emergency exists, is a question for the jury;" and here the jury have passed on this question adversely to the defendant.
With reference to the proposition that Pease warned or attempted to warn the plaintiff at the crossing, that the plaintiff had failed to heed the warning, and that this failure was itself the cause and convicted the plaintiff of contributory negligence — it is sufficient to say that the undisputed proof by Pease himself is that the defendant in error, as she started over the crossing, did not hear him or did not appear to see the signals which he was making to try and convey to her the approach of the oncoming train. Thus this proposition cannot be sustained. Baker v. Hodges (Tex.Civ.App.) 231 S.W. 844. Under his charge, the judge left it to the jury to say whether it was negligence of the agents of the railroad company to use the means at hand in an effort to avoid injuring the plaintiff on a frequently used railroad crossing. We do not think that the judge committed reversible error for the reasons urged. Baker v.
Hodges, supra; 3 Blashfield's Cyc., 84, 85, § 1710.
2. "`A jury in arriving at a conclusion upon disputed issues of fact may believe a part of the testimony of a witness or witnesses, and reject another part thereof, it being their duty to ascertain the truth of the case from the opinion they entertain of all the evidence submitted for their consideration.'" Reaves v. Columbus Electric c. Co., 32 Ga. App. 140,151 (122 S.E. 824). Relative to the contention that the contributory negligence of the plaintiff was the cause of the injury — taking that view of the evidence most favorable to upholding the verdict, for every presumption and every inference is in its favor, the jury were authorized *Page 657 
to find that the plaintiff had arrived in a position of peril before she became cognizant of the approaching, onrushing train, by reason of obstructions in the nature of bushes, undergrowth, etc., which cut off her view of the railroad track in the direction from which the train approached her, and by reason of the fact that the train approaching her on the crossing could not be seen from the crossing at the proper place to look for an approaching train until it had "rounded" the curve a quarter of a mile distant from the crossing; and that on the occasion in question the train was running sixty miles per hour as it rounded the curve, and continued so to run until it struck the plaintiff at the frequently traveled public crossing in an unincorporated village; and further authorized to find that under the running of the train at such a speed it would have taken only fifteen seconds for the train to have traveled from the curve where the plaintiff could have first seen it to the crossing where it struck her; and to find that, even if her hearing was "impaired," yet, she took extraordinary care by approaching the crossing at a very slow rate of speed of about ten miles per hour, and looked in both directions at the proper distance under the circumstances before she crossed the track. Beckworth v. State, 60 Ga. App. 688
(4 S.E.2d 707).
This case is differentiated on the facts from Richardson v.Pollard, 57 Ga. App. 777 (196 S.E. 199), and the cases cited, and from Southern Ry. Co. v. Jay, 137 Ga. 60 (2b) (72 S.E. 470), See 38 Am. Jur. 895. This case is also different from Krik v. Savannah Electric c. Co., 50 Ga. App. 468
(178 S.E. 470), and cit., and Thomas v. Central of Georgia Ry.Co., 121 Ga. 38 (48 S.E. 683), cited by the plaintiff in error in his brief. In these last two cases a deliberate attempt to cross ahead of an approaching train in plain sight, based on the motorist's personal calculations as to the respective speed and distance of the train and the plaintiff's own automobile, cast on the driver the risk of the attempt, which responsibility he could not escape because of his erroneous estimate of the chances. 3 Blashfield's Cyc., 228 (71) § 1818. Where, by some reason or cause not attributable to negligence on the part of a motorist, he has arrived at a position of peril before he becomes cognizant of the approach of an onrushing train, and in an effort to escape injury in the emergency which confronts him, he attempts to cross over the crossing, where *Page 658 
he is struck by the train, the usual condemnation of crossing in front of an oncoming train as negligence as a matter of law has no application. 3 Blashfield's Cyc. 228 (71), § 1818.
Relative to the negligence of the railroad company — under the above rules, and taking that view of the evidence most favorable to the upholding of the verdict the jury were authorized to find that, when Pease pulled the semaphore signal switch, the train was just rounding the curve a quarter of a mile away; that he immediately cut his eyes around and saw the plaintiff approaching the public crossing; that he knew her hearing was impaired and knew of the obstruction which prevented her from seeing the approaching train until she was almost upon the railroad track; that he knew the approximate speed was about fifty-five or sixty miles per hour, and that it was customary for the train to travel at this rate when traveling over the crossing, if there was no order by the semaphore to either slow down or stop; that under the engineer's testimony, his schedule called for such a speed at the place where the injury occurred that it would take about 15 seconds to reach the crossing from the curve, the plaintiff's view being obstructed until she was approximately eight feet from the crossing; that a signal by Pease, the station agent using the semaphore, to slow down or stop the train would have prevented the injury; that if the station agent, having had time to go from the depot to the public crossing in an endeavor to wave the plaintiff down, instead of so doing, had used the semaphore to slow down or stop the train, the collision would not have occurred; that even a signal to slow down would in all probability have prevented the injury, as the train would have crossed the public crossing just a few seconds later than it did, and would not have struck the automobile and injured the plaintiff; and that the automobile had almost cleared the track as it was struck by the train at a point on the left rear fender where gas is put in the tank. Thus we think that the rule inSouthern Railway Co., v. Slaton, 41 Ga. App. 759
(153 S.E. 718), which has been many times announced, that questions as to diligence and negligence, including contributory negligence, and what negligence constitutes the proximate cause of the injury complained of, was applicable to the instant case.
3. The evidence authorized the verdict and the judge did not err in refusing the motion for a new trial. *Page 659 
There being a dissent in the division of this court to which this case was originally assigned, the case was considered and decided by the court as a whole, pursuant to the act of the General Assembly, approved March 8, 1945 (Ga. L., 1945, p. 232).
Judgment affirmed. Gardner and Parker, JJ., concur. Sutton,P. J., concurs in the judgment.